**J. B. TAYLOR et al., Plaintiffs,**

v.

**E. P. PERINI, Superintendent Marion Correctional Institution, Defendant.**

### Civ. No. C 69–275.

United States District Court, N. D. Ohio, W. D.

Sept. 23, 1976.

See also D.C., 413 F.Supp. 189.

---

Niki Z. Schwartz, Cleveland, Ohio, for plaintiffs.

Atty. Gen. Office of Ohio, Columbus, Ohio, for defendant.

### MEMORANDUM AND ORDER

DON J. YOUNG, District Judge:

This action came to be heard upon the Second Report of the Special Master on Defendant's State of Compliance with the Court's order of September 12, 1972. Said report is attached hereto as Appendix A, incorporated herein by reference, and made a part hereof as fully for all intents and purposes as if set forth at length herein.

The defendant has filed objections to the second report. In addition, the defendant moves the Court to find him in compliance with ¶ 5 and to modify ¶ 8(d) of the order.

### THE COURT FINDS AND ORDERS AS FOLLOWS:

1. With regard to ¶ 9, Report p. 767, the objection of the defendant to the master's finding is premature. The Court will defer ruling upon this objection until some future time.

2. With regard to ¶ 11, Report p. 773, the objection of the defendant is well taken, and the following sentence shall be incorporated at line 8 on said page 774 of the second report as confirmed:

> Compliance will be monitored on a monthly basis by averaging the weekly reports for each cellblock and dormitory. If the average for the month is within ±5% deviation factor, the institution should be considered in compliance.

3. With regard to ¶ 8, Report p. 756, the objection of the defendant to the master's finding is overruled.

4. The Second Report of the Special Master is in all other respects confirmed.

5. The motion of the defendant to modify ¶ 8 of the September 12, 1972 order is continued pending further report by the Special Master.

6. The motion of the defendant for a finding of compliance with ¶ 5 of the September 12, 1972 order is granted with the understanding that the Honor Dormitory Law Library will be completed.

IT IS SO ORDERED.

## APPENDIX A

### SECOND REPORT OF THE SPECIAL MASTER ON THE DEFENDANT'S STATE OF COMPLIANCE

Submitted by Vincent M. Nathan,* Special Master.

### INTRODUCTION

On March 29, 1976, the Special Master submitted his first report on the defendant's state of compliance with the Court's order of September 12, 1972 in the case of *Taylor v. Perini*. In the introduction to that report, the Special Master stated, "Upon the Court's adoption of the findings of the Special Master contained herein, compliance plans can be developed quickly with respect to some areas of noncompliance and only with expenditure of great time and effort as to others." *Taylor v. Perini*, 413 F.Supp. 189, 199 (N.D.Ohio 1976). That report was confirmed by the Court on April 9, 1976, there having been no objections filed by any of the parties. *Id.* at 193. The purpose of this second report is to relate steps which have been taken since that time to bring about a state of compliance with the Court's order and to identify those areas in which further effort is necessary.

The Special Master is again in a position to report that he has received the fullest extent of cooperation from Superintendent E. P. Perini and his staff. In developing and effectuating plans of compliance, particularly with respect to some of the more difficult problems posed by the Court's order, the Special Master has been aided immensely by representatives of the Office of the Attorney General of the State of Ohio, particularly Ms. Maryann Baker Gall. All counsel in the case have extended themselves to be of assistance, and the Inmate Liaison Committee has continued to function in a constructive and helpful manner. Finally, Director George Denton and the members of his staff at the Department of Rehabilitation and Correction have been extremely cooperative and have made a very significant contribution to the emerging state of compliance reflected by this report.

In view of the lengthy and detailed first report of the Special Master, this report will follow a somewhat simplified format. It will assume familiarity with or access to the terms of the Court's order of September 12, 1972, the contents and findings of the *First Report of the Special Master on the Defendant's State of Compliance*, and the relevant departmental Administrative Regulations contained in the appendices thereto. All of these are available in the official report of *Taylor v. Perini*, 413 F.Supp. 189 (N.D.Ohio 1976).

### PROHIBITORY PARAGRAPHS

The creation of an effective and independent grievance system to deal with allega-

* Professor of Law, the University of Toledo.

tions of racial discrimination, harassment, intimidation or insult, allegations of violations of other provisions of the Court's order in *Taylor v. Perini*, and general inmate grievances continues to occupy a position of highest priority in the development of an overall plan for continuing and permanent compliance with the prohibitory paragraphs of the Court's order. Indeed, in the absence of such a system, a release of jurisdiction by the Court is likely to result in slippage which over the course of time may lead to new litigation over some institutional practices which are the subject of *Taylor v. Perini*.

Formal grievances continue to be filed with the institutional Inmate Liaison Officer at Marion Correctional Institution (M.C.I.), and the rate of filing of such grievances has increased since the submission of the first report of the Special Master. According to the Inmate Liaison Officer, 57 formal grievances were filed between April 1, 1976 and August 11, 1976. In addition, six to eight informal grievances are lodged with that officer every day. In spite of the Superintendent's directive of April 9, 1976, that his Administrative Assistant, Mr. W. J. Whealon, assume "extra jurisdiction . . . to monitor the I.L.O. function" and the provision of such time saving conveniences to the institutional grievance officer as a dictaphone for recording correspondence, that office remains inadequate to deal effectively with the present volume of serious grievances. In particular, several correctional officers are the subjects of serious and repeated allegations by inmates, and effective investigation of these complaints cannot be accomplished within the framework of the present institutional and departmental grievance procedure.

Negotiations between the Special Master and Director George Denton resulted in agreement on June 4, 1976, that the Director would appoint a special committee to "propose a more effective independent inmate grievance system for the Department." That committee was appointed in June, 1976, and consists of the following members:

*Mr. John Conrad*, Chairman. Mr. Conrad is Senior Fellow for the Center on Crime and Justice at the Academy for Contemporary Problems in Columbus, Ohio.

*Dr. Henry Burns.* Dr. Burns is the Chairman of the Department of Criminal Justice at the University of Missouri at St. Louis.

*Mr. William Dallman.* Mr. Dallman is the Superintendent of Lebanon Correctional Institution in Lebanon, Ohio.

*Mr. Terry Taylor.* Mr. Taylor is the Deputy Superintendent of Treatment Services at London Correctional Institution in London, Ohio.

*Mr. Thomas Adkins.* Mr. Adkins is the Assistant Personnel Administrator and the EEO Coordinator for the Ohio Department of Rehabilitation and Correction.

*Professor Vincent Nathan*, in his capacity as Special Master in *Taylor v. Perini*.

Mr. Kenneth Cookson, who continues to serve as the Assistant to the Special Master, is providing staff support for this committee. After an initial organizational meeting, the special committee met with Mr. George Miller, who served as departmental ombudsman from November, 1972 to February, 1975, when that office was discontinued. Another meeting was held with institutional Inmate Liaison Officers from seven of Ohio's eight correctional institutions. A subcommittee met with Mr. Maury Koblentz, who presently serves as the Grievance Appeal Officer of the Department of Rehabilitation and Correction, and the entire committee met with Mr. Michael K. Lewis, a member of the staff of the Center for Community Justice in Washington, D. C. As of the date of this report, several additional meetings are scheduled, and the committee plans to present its recommendations to Director Denton by September 30, 1976.

While it would not be appropriate to attempt to predict the substance of this committee's eventual recommendations, the Special Master can report at this time that the evidence which the committee has heard to date has convinced him that the inade-

quacies in the institutional grievance system reported to the Court in March, 1976, are present in correctional institutions other than M.C.I. Furthermore, there is no monitoring of the local institutional grievance systems by any agent of the Department of Rehabilitation and Correction.

The report of the special committee, together with Mr. Denton's response thereto, will be submitted to the Court as soon as they become available. It is the hope and expectation of the Special Master that the report of the committee will provide the impetus for the development of a more effective and independent grievance system which in turn will satisfy the Court that the progress which has been accomplished in *Taylor v. Perini* will be of more than transitory effect.

An essential element in any effective institutional grievance procedure is a mechanism which is designed to bring problems to the attention of the administration before they become the subject of repeated individual grievances. Many such problems are essentially nothing more than a failure of communication between prison officials and inmates; others can be alleviated by administrative action before they become serious. The most effective mechanism for this purpose is an ongoing inmate council representing the entire institutional population.

On May 28, 1976, the Director of the Department of Rehabilitation and Correction instructed Superintendent Perini to implement a permanent inmate council. Shortly thereafter, the Special Master discussed procedures for the election of such a committee with Mr. Perini and with the Inmate Liaison Committee. Agreement was reached that each housing area in the stockade would elect one representative and two alternates; in addition, the 32 man Hispanic/American population would elect one representative and alternates, and a separate six man council would be established for the honor dormitory. An election committee of four persons was designated, consisting of the Associate Superintendent for Treatment Services, the Assistant to the Special Master, and two inmate members of the Inmate Liaison Committee. Elections were held on August 6, 1976, and all locks as well as the Hispanic/American inmates elected representatives and alternates. As of the date of this report, the new council is attempting to organize itself and to adopt proposed guidelines for its future activities.

With the formation of the M.C.I. Inmate Council, the Inmate Liaison Committee will cease to function. The Special Master will work with a committee of the new Council in order to obtain necessary resident input for the development of future compliance plans and for the purpose of monitoring the institution's actions under plans which are under way and described in this report. At the same time, the Inmate Council will begin to work directly with staff and administration at M.C.I. to deal with the entire range of problems perceived by inmates.

It is not the expectation of the Special Master that the new Inmate Council will accomplish miracles at the institution. Hopefully, however, both staff and inmates will act with patience and reason in order to begin to develop a constructive mechanism for the resolution of problems. In this way, litigation like *Taylor v. Perini* may be able to be avoided in the future.

## CONCLUSIONS AND RECOMMENDATIONS

Any finding of compliance with the prohibitory paragraphs of the Court's order must await the development and implementation of a more effective and independent inmate grievance system. In addition, the effectiveness of the new Inmate Council must be evaluated on the basis of experience over the next several months. It is the recommendation of the Special Master that the Court await these developments before reaching any conclusion with respect to the state of compliance with the prohibitory paragraphs of its order of September 12, 1972.

## MANDATORY PARAGRAPHS

### PARAGRAPH 1

Procedures detailed in the first report of the Special Master to reduce the incidence

of error in the handling of incoming legal mail continue in effect at M.C.I. Superintendent Perini has spent a substantial amount of his own time monitoring mail room activities. In addition, Mr. Perini and the Special Master have issued orders to all mail room personnel making clear the requirements of proper treatment of incoming legal mail.

Six pieces of legal mail, clearly marked as such, were opened improperly outside the presence of the inmate/addressee in early March, 1976. All envelopes were postmarked March 4 or March 5, indicating that all of these errors occurred on one or at most two days. It was during this time that the Special Master was preparing his first report to the Court, and the institution was not aware of the contents of that report.

Another incident occurred on March 8, 1976, when a letter from the Summit County Clerk of Courts was opened in the outside mail room. This letter was addressed in the following manner:

> Dept. of Rehabilitation &
> Correction
> Marion Correctional Inst.
> Box 57
> Marion, Ohio 43302
> ATT: David J. Lott
> # 142–216

Since March 8, only two errors have occurred with respect to treatment of incoming legal mail. On June 7, 1976, a letter bearing a clear return address of a Columbus, Ohio, attorney was opened in the outside mail room; on July 26, 1976, a letter bearing the return address of the Special Master was opened inadvertently. On both occasions, the Superintendent wrote a letter of apology to the sender assuring that the contents of the communications had not been read by any member of the staff.

Problems with respect to general mail delivery continue to affect the receipt and sending of legal mail. One of these, the failure to deliver incoming mail not bearing an inmate's number—was dealt with by Superintendent Perini insofar as it affected legal mail in a memorandum of June 29, 1976. In this memorandum, Mr. Perini ordered that legal mail not bearing an inmate's number was to be delivered if at all possible, and that it should be returned to the sender only as a last resort. Other steps ordered by Mr. Perini include the daily checking of inmate transfer sheets to determine inmates' locations, a bi-monthly check of all absent-with-leave folders in order to reduce delay in delivery of mail to inmates who have returned from court appearances or from treatment in the Central Medical and Reception Center in Columbus, and the daily update of inmate locator cards which are used by the outside mail room personnel. All of these will improve delivery of legal as well as ordinary mail.

Although inmates continue to complain about delays with respect to delivery of both incoming and outgoing mail, the Special Master has not been able to ascertain whether such delays result from institutional procedures or from those of the United States Postal Service. These delays, however, have serious ramifications with respect to legal mail. For example, an appeal which was signed and allegedly mailed by an inmate on April 21 did not reach the Sixth District Court of Appeals in Toledo until April 28, resulting in the dismissal of the appeal for untimely filing. When the delay was brought to the attention of the Court of Appeals, the Court accepted an affidavit from the affected inmate and granted leave for extra time to file the appeal.

## CONCLUSIONS AND RECOMMENDATIONS

The Special Master concludes that the record of error in the treatment of incoming legal mail since March 8, 1976, supports a finding of compliance on the part of the institution with that portion of Paragraph 1 of the Court's order prohibiting obstruction, censorship, reading, or copying of legal mail as well as that portion which requires that such mail be opened and inspected for contraband only in the presence of the inmate/addressee. As was pointed out in the first report of the Special

Master, some incidence of error is bound to occur, and the occurrence of two errors in more than five months probably represents an irreducible minimum given the large quantity of mail processed daily by the institution. It is the recommendation of the Special Master that the Superintendent continue to send letters of apology to senders of legal mail which is opened improperly before delivery to the inmate. This will make attorneys and other public officials aware of errors affecting their mail and may result in their own inquiries in the event of repeated error. Finally, it is the recommendation of the Special Master that the Superintendent continue to make every effort to improve service with respect to both incoming and outgoing mail so as to reduce to the greatest extent possible incidents of delay, loss and misdelivery of mail.

## PARAGRAPH 2

A number of steps have been taken by the institution since the confirmation of the first report of the Special Master to bring about compliance with Paragraph 2 of the Court's order. One additional inmate legal clerk has been appointed to serve the population in the stockade. As of July 31, 1976, the total stockade population was 1152; thus the ratio of inmate legal clerks to inmates was 1:384, which is slightly better than the ratio at Southern Ohio Correctional Facility disclosed in the first report of the Special Master. As experience is gained with the work load of the inmate legal clerks, the Director of the Education Department has assured the Special Master that additional assignments will be made if necessary.

Control and direction of the law library has been transferred to the Director of the Education Department whose responsibilities include as well the general library. With the appointment of a full-time librarian, one of the most important needs described in the first report of the Special Master has been met. The space allocated to the stockade law library has been increased to approximately 17' x 16' and law library hours have been extended to 12:30 p. m. to 8:30 p. m. on Monday through Friday, 9:00 a. m. to 4:00 p. m. on Saturday, and 1:00 p. m. to 4:00 p. m. and 5:30 p. m. to 8:30 p. m. on Sunday. Although the law library collection continues to fall short of standards suggested by the Department of Rehabilitation and Correction as well as those of the American Association of Law Libraries, the Special Master has been assured by Mr. Stephen Yost of the Department that additional books will be ordered. The Special Master has employed Professor Rhoda L. Berkowitz, Associate Law Librarian at The University of Toledo, to compile a list of needed legal materials and to submit that list to Mr. Yost.

One of the most important developments with respect to Paragraph 2 of the Court's order is the agreement on the part of Superintendent Perini to open and maintain a separate law library in the honor dormitory. Certain legal materials which are duplicated in the stockade law library will be transferred to the honor dormitory, and new materials which are needed will be purchased by the Department of Rehabilitation and Correction. Adequate space has been assigned for the new facility, and installation of shelving and furniture should be complete within thirty days. Several inmate legal clerks will be assigned to the honor dormitory library. Professor Berkowitz has agreed to assist in the arrangement and ordering of materials for the new unit as well as to instruct the institution's new librarian on law library maintenance and use.

On June 23, 1976, Superintendent Perini caused all references to inmate William Hill's conviction for Class II, Rule 19 offenses to be expunged from his official record. The details of this matter may be found in the first report of the Special Master in *Taylor v. Perini*, 413 F.Supp. 189, 203–204 (N.D.Ohio 1976). No further instances of harassment of inmates assisting one another in the conduct of their legal affairs has come to the attention of the Special Master.

In accordance with a new institutional policy of admitting publications from any

source, legal publications from sources other than the publisher are now being admitted without difficulty. A notice has been posted in the law library which makes it clear that petitions for habeas corpus need not be submitted in advance to the Superintendent in connection with requests for certification of indigency. Finally, an organized effort was made by a number of inmates to collect funds to send to a Columbus attorney as a retainer for services in a class action relating to the retroactive application of recent Ohio legislation. The Superintendent was aware of this effort and made no effort whatsoever to impede it; to the contrary, all cash slips signed by inmates in connection with this activity were processed.

Access to inmate legal clerks by inmates requiring assistance is still somewhat of a problem in the stockade. All interviews are held in the law library area, and these create difficulty for other inmates attempting to read or type. All such interviews must be held during the regular law library hours. In the near future the Special Master will work with appropriate staff members to attempt to devise a solution to this difficulty.

## CONCLUSIONS AND RECOMMENDATIONS

It is the conclusion of the Special Master that activities which are described above including the completion of steps which are underway will constitute full compliance with Paragraph 2 of the Court's order.

## PARAGRAPH 3

With the transfer of the law library from the jurisdiction of the Associate Superintendent for Treatment to that of the Director of the Education Department, legal supplies required by Paragraph 3 of the Court's order are the responsibility of the new institutional librarian. The inmate legal clerks report that adequate supplies of paper and pencils are maintained in the stockade library; ballpoint pens apparently disappear almost as soon as they appear in the law library. Pens and pencils are avail-

able in the commissary, and no inmate has ever complained about their unavailability. With the opening of the new law library in the honor dormitory, legal supplies will become more available to residents of that unit.

Late in June, 1976, two staff members became notaries public and began to provide notarial service for inmates. One of these is an officer on the first shift (8:00 a. m. to 4:00 p. m.) in the honor dormitory; the other is a correctional officer assigned to the library in the stockade. This brings the total of notaries available to the inmate population to five. All reports are that notarial services have been available without undue delay or difficulty in both units of the institution.

Finally, inside mail room personnel have been instructed to provide certified as well as special delivery, registered and regular postage on credit for legal mail, and such postage appears to be available to inmates at all times.

## CONCLUSIONS AND RECOMMENDATIONS

In the judgment of the Special Master, the institution is in full compliance with the requirements of Paragraph 3 of the Court's order.

## PARAGRAPH 4

On April 13, 1976, four days after the confirmation of the first report of the Special Master, Superintendent Perini appointed a three man Publication Review Committee to examine incoming publications thought to be obscene or to constitute a clear and present danger to the safety or security of the institution. The members of that committee were the Associate Superintendent of Treatment Services (chairman), the institution's librarian, and a correctional officer assigned to assist the librarian. On May 26, 1976, this Court made a finding of civil contempt against Paul J. Butchko, then serving as Associate Superintendent for Treatment Services, and Mr. Butchko resigned from his position on the institu-

tional committee in order to purge himself of contempt. On May 28, 1976, Superintendent Perini appointed John Morgan, the Director of Social Services, to serve as acting chairman of the committee, and Mr. Morgan continues to serve in that position. Mr. W. J. Whealon, in his capacity as general coordinator of all institutional efforts to achieve compliance with the Court's order of September 12, 1972, has participated in the deliberations of the committee. The new institutional Publications Review Committee meets all the requirements of subparagraph 4(b) of the Court's order. The Special Master has attended and observed a number of the meetings of the new committee.

Shortly after its formation, the Publications Review Committee adopted specific criteria of non-acceptability of incoming publications which are obscene or which constitute a clear and present danger to the security or safety of the institution. These standards were prepared by the Special Master and are attached as Appendix A, p. 775 *infra.* The Special Master is pleased to report that the Chairman of the Department's Publications Screening Committee is in the process of drafting amendments to Administrative Regulation 814(b) which will incorporate these specific criteria for "obscenity" and "clear and present danger." The result will be a department-wide application of standards complying with the Court's order in *Taylor v. Perini.*

The institutional committee also adopted procedures in accordance with the requirements of subparagraphs 4(c) through 4(f) of the Court's order. Under these procedures, the inmate/addressee receives notice of the interim prohibition of intercepted material on the working day following initial arrival at the institution of the material in question. This notice, Appendix B, p. 776 *infra,* identifies the questionable material, states the reason for the interim prohibition, and informs the inmate of his right to an appearance before the Publications Review Committee. The Committee meets every Friday, except those falling on legal holidays, and any inmate wishing to appear

before the Committee does so on the Friday following the institution's receipt of the material. A decision is rendered on that date and the inmate is given written notice of the decision and the reasons therefor on the following working day. If the decision is unfavorable, the inmate is notified of his right to appeal, Appendix C, p. 777 *infra,* and an appeal form is provided. Appendix D, p. 778 *infra.* If the decision is to admit the publication, the inmate receives a different notice together with the publication in question. Appendix E, p. 779 *infra.* The chairman of the Committee maintains records of all cases. Appendix F, p. 780 *infra.*

The phenomenon of exclusion under the new standards and procedures has been curtailed drastically. The first report of the Special Master indicated that 28 instances of exclusion occurred under the old system between January 1, 1976 and February 17, 1976. *Taylor v. Perini,* 413 F.Supp. 189, 213 (N.D.Ohio 1976). Approximately ten incidents of exclusion occurred in the more than three months from April 30, 1976 until August 9, 1976.

Application of criteria, even specific ones, involves a high degree of subjective judgment. While the Special Master has not been in agreement with all of the substantive decisions rendered by the new Publications Review Committee, all have been reasonable interpretations and applications of the adopted criteria. The inclusion of a particular publication on the Department's "not to be permitted" list, while taken into account by the institutional committee, is not regarded as binding. As a result some publications banned by the Department's Publications Screening Committee have been admitted by the institutional committee. On the other hand, the presence of a publication on the Department's "to be permitted" list results automatically in the admission of that publication at M.C.I. The reason for this is that any appeal of a local exclusion of such material would be successful.

The institution's former ban upon photographs of inmates' wives and girl friends

has been lifted, and these materials are screened in accordance with the specific standards for obscenity which have been adopted. Pre-recorded tape recordings prepared by a relative or friend of the inmate are not screened under the new standards. They are inspected for contraband and listened to by the institution's vault officer only for the purpose of determining that the tapes are indeed personal and not commercial in nature. Commercially recorded tapes are subjected to full screening in accordance with the new institutional standards.

Effective steps have been taken to insure that publications are admitted from any source. All mail room personnel as well as officers inspecting materials arriving through visits have been informed that printed materials may be received from other sources as well as from publishers. It appears that all such material is being admitted and that all questionable material is being forwarded for review to the Publications Review Committee. Both Associate Superintendent W. J. Whealon and Mr. John Morgan are monitoring this process carefully, and the absence of inmate complaints indicates that all staff are cooperating.

One problem remains with respect to compliance with this paragraph of the Court's order. Subparagraph 4(e) requires that any appeal lodged with the Department's Publications Screening Committee be decided within two weeks. Because several members of this committee are outside volunteers (including a college librarian and an attorney), the chairman has indicated that bi-weekly meetings are extremely difficult if not impossible. As a result, he has asked for a total of 28 working days for the Committee to make its recommendation and for the Director to take final action and to inform the affected inmate of that action.

## CONCLUSIONS AND RECOMMENDATIONS

The Special Master concludes that the institution is in full compliance with the requirements of Paragraph 4. Because of the desirability of including persons not employed by the Department of Rehabilitation and Correction on the Department's appeals committee, the Special Master recommends that subparagraph 4(e) of the Court's order of September 12, 1972, be modified to provide for a decision on appeals not later than 28 working days following the receipt of any appeal in Columbus. Finally, the Special Master recommends that the membership on the three man institutional Publications Review Committee remain as stable as possible in order to promote continuity and consistency in that committee's actions. In view of Mr. W. J. Whealon's recent appointment to the position of Associate Superintendent of Treatment Services and the numerous duties attendant thereto, however, it is not necessary that he continue to monitor the meetings of the Publications Review Committee.

## PARAGRAPH 5

Book orders submitted by the Department of Rehabilitation and Correction as well as visual inspection of library books by the Special Master and his Assistant, established the following data with respect to the books required to be purchased by Paragraph 5 of the Court's order:

| No. | TITLE | NUMBER REQUIRED BY ORDER | ON SHELF OR CHECKED OUT | OUT OF PRINT OR UNAVAILABLE | NUMBER ORDERED |
|---|---|---|---|---|---|
| 1 | African Affairs | 1 | 1 | | |
| 2 | Afro USA | 1 | | | 1 |
| 3 | I Know Why Caged Birds Sing | 3 | 2 | | 1 |

| No. | TITLE | NUMBER REQUIRED BY ORDER | ON SHELF OR CHECKED OUT | OUT OF PRINT OR UNAVAILABLE | NUMBER ORDERED |
|---|---|---|---|---|---|
| 4 | Negro Slave Revolts | 1 | 1 | | |
| 5 | Go Tell It on the Mountain | 1 | 1 | | |
| 6 | Tell Me How Long the Train's ... | 1 | 1 | | |
| 7 | Freedom Summer | 1 | 1 | | |
| 8 | What Manner of Man? | 1 | 1 | | |
| 9 | Black Scholar | 1 | 1 | | |
| 10 | Black World | 1 | | | 1 |
| 11 | American Negro Poetry | 1 | 1 | | |
| 12 | Negro Leader in Time of Crisis | 1 | 1 | | |
| 13 | Life & Loves of Mr. Jive-Ass Nigger | 1 | 1 | | |
| 14 | Manchild in the Promised Land | 1 | 1 | | |
| 15 | Die Nigger Die | 1 | | | 1 |
| 16 | Five Plays | 1 | 1 | | |
| 17 | Black Power | 1 | 1 | | |
| 18 | Malcolm X: Man & His Times | 1 | | | 1 |
| 19 | Dark Ghetto | 1 | 1 | | |
| 20 | Soul on Ice | 1 | 1 | | |
| 21 | Justice Denied | 1 | | | 1 |
| 22 | Rivers of Blood, Nights of Darkness | 3 | 3 | | |
| 23 | Black Theology | 1 | 1 | | |
| 24 | Black Moses | 1 | 1 | | |
| 25 | Crises of the Negro Intellectural | 1 | 1 | | |

| No. | TITLE | NUMBER REQUIRED BY ORDER | ON SHELF OR CHECKED OUT | OUT OF PRINT OR UNAVAIL-ABLE | NUMBER ORDERED |
|---|---|---|---|---|---|
| 26 | The American Slave Trade | 3 | 2 | | 1 |
| 27 | If They Come in the Morning | 1 | 1 | | |
| 28 | Black Reconstruction | 3 | 3 | | |
| 29 | Souls of Black Folk | 3 | | 3 | |
| 30 | Invisible Man | 3 | 3 | | |
| 31 | Black Nationalism | 3 | 2 | | 1 |
| 32 | Black Skin, White Mask | 1 | 1 | | |
| 33 | Wretched of the Earth | 1 | 1 | | |
| 34 | Negro Slave Song | 1 | 1 | | |
| 35 | Negro Slave & Protest Songs | 1 | | | 1 |
| 36 | Conjure Man Dies | 1 | 1 | | |
| 37 | Walls of Jerico | 1 | 1 | | |
| 38 | Emancipation Procla-mation | 1 | 1 | | |
| 39 | From Slavery to Freedom | 3 | 2 | 1 | |
| 40 | Reconstruction | 1 | 1 | | |
| 41 | The Negro Family in the U.S. | 1 | 1 | | |
| 42 | Freedom Ways | 1 | 1 | | |
| 43 | Black Feeling, Black Talk | 1 | | | 1 |
| 44 | Rebellion in Newark | 1 | | 1 | |
| 45 | Blood in My Eye | 1 | | | 1 |
| 46 | Autobiography of an Ex-colored Man | 1 | 1 | | |
| 47 | Blues People | 1 | 1 | | |

| No. | TITLE | NUMBER REQUIRED BY ORDER | ON SHELF OR CHECKED OUT | OUT OF PRINT OR UNAVAIL- ABLE | NUMBER ORDERED |
|---|---|---|---|---|---|
| 48 | The Dutchman & the Slave | 1 | 1 | | |
| 49 | Home | 1 | 1 | | |
| 50 | The Journal of Negro History | 1 | | | 1 |
| 51 | And Then We Heard Thunder | 1 | | | 1 |
| 52 | Stride Toward Freedom | 1 | 1 | | |
| 53 | The Trumpet of Conscience | 1 | 1 | | |
| 54 | Where Do We Go From Here | 1 | 1 | | |
| 55 | Why Can't We Wait | 1 | 1 | | |
| 56 | King: A Critical Biography | 1 | 1 | | |
| 57 | Black Folk Tales | 1 | 1 | | |
| 58 | Look Out Whitey; ... | 1 | | | 1 |
| 59 | Black Muslims in America | 1 | 1 | | |
| 60 | Autobiography of Malcolm X | 3 | 3 | | |
| 61 | Riots & Rebellion | 1 | 1 | | |
| 62 | The Hit | 1 | | 1 | |
| 63 | Banjo | 1 | 1 | | |
| 64 | Home to Harlem | 1 | | 1 | |
| 65 | My Daddy was a Number Runner | 3 | 2 | | 1 |
| 66 | Inside | 1 | | 1 | |
| 67 | American Negro Revolution | 1 | 1 | | |

| No. | TITLE | NUMBER REQUIRED BY ORDER | ON SHELF OR CHECKED OUT | OUT OF PRINT OR UNAVAILABLE | NUMBER ORDERED |
|---|---|---|---|---|---|
| 68 | African Traditional Religions | 1 | 1 | | |
| 69 | Diary of a Sit-in | 1 | 1 | | |
| 70 | Black Abolitionist | 1 | 1 | | |
| 71 | Mr. Lincoln & the Negroes | 1 | 1 | | |
| 72 | The Negro in the Civil War | 1 | 1 | | |
| 73 | Black America | 1 | | | 1 |
| 74 | Seize the Time | 1 | | | 1 |
| 75 | Crisis in Black & White | 1 | 1 | | |
| 76 | Mississippi; The Closed Society | 1 | 1 | | |
| 77 | Rhetoric of Black | 1 | 1 | | |
| 78 | The Peculiar Institution | 3 | 3 | | |
| 79 | The Story of Jazz | 1 | 1 | | |
| 80 | Black Political Power in the United States | 1 | | | 1 |
| 81 | Letters from Mississippi | 1 | | 1 | |
| 82 | Black Religion | 1 | 1 | | |
| 83 | From Race Riot to Sit-in | 1 | | 1 | |
| 84 | Freedom Now! | 1 | 1 | | |
| 85 | The Man Who Cried I Am | 1 | 1 | | |
| 86 | Strange Career of Jim Crow | 1 | 1 | | |
| 87 | Native Son | 3 | 3 | | |
| 88 | Uncle Tom's Children | 3 | 3 | | |
| 89 | The Choice, Issue of Black Survival in America | 1 | | | 1 |

| No. | TITLE | NUMBER REQUIRED BY ORDER | ON SHELF OR CHECKED OUT | OUT OF PRINT OR UNAVAILABLE | NUMBER ORDERED |
|---|---|---|---|---|---|
| 90 | Beyond Racism | 1 | | | 1 |
| 91 | The New Abolitionists | 1 | 1 | — | — |
| | TOTAL | 117 | 87 | 10 | 20 |

Thus 87 of the required 117 volumes are presently held by the institution's library. This compares to a total of 28 volumes held at the time of the first report of the Special Master. *Taylor v. Perini*, 413 F.Supp. 189, 215–219 (N.D.Ohio 1976). All titles have been ordered by the Department of Rehabilitation and Correction. Ten volumes which were ordered cannot be located or are unavailable according to the Baker-Taylor Company, the jobber with whom the Department placed its order. Efforts are being made at this time to locate used copies of these titles.

### CONCLUSIONS AND RECOMMENDATIONS

■ Although the institution is not yet in full compliance with the requirements of Paragraph 5, substantial progress has been made. In the near future all but ten volumes should arrive in Marion. It is probable that some of these ten "out of print" volumes will not be obtainable or that their purchase will be inordinately expensive. It is the recommendation of the Special Master that the Court give consideration to a motion on the part of the defendant to excuse the purchase of such volumes as remain unavailable after a reasonable effort has been made to obtain them from used book sellers.

### PARAGRAPH 6

In order to provide fair notice of all rules and regulations together with the sanctions for the violation thereof, a complete rewriting of the current Inmate Manual is required. The Associate Superintendent for Custody has instructed the training officer at M.C.I., Mr. Jay Tripp, to prepare copy for a new manual. Much of that copy has been produced in rough draft form. As soon as possible after the submission of this report, the Special Master will begin to work with Mr. Tripp and a small staff committee to produce final copy for the manual, and publication can be expected in the Fall of 1976. All of the problems discussed in the first report of the Special Master will be dealt with in the new manual. *Taylor v. Perini*, 413 F.Supp. 189, 221–235 (N.D.Ohio 1976).

### CONCLUSIONS AND RECOMMENDATIONS

Full compliance with this paragraph of the Court's order can be predicted with certainty. The Special Master has found it necessary to accord priorities to the development of the numerous compliance plans required by the Court's order of April 9, 1976, confirming the first report of the Special Master. Since the order of September 12, 1972, does not relate to the substance of the institution's rules, but merely requires that fair notice be given to inmates, the development of a draft document by the institution's staff was regarded as essential. Thus the institution should be considered at this time to have made reasonable progress with respect to compliance with Paragraph 6.

### PARAGRAPH 7

The Associate Superintendent for Custody has continued to provide the Special Master with weekly summaries of all actions of disciplinary hearing officers and the Rules Infraction Board. These records are supplemented by daily inmate transfer sheets and diagrams of all correctional cells containing the name, number, and race of each inmate incarcerated therein each day. According to these records, only two inci-

dents of violation of subparagraph 7(a) have occurred since the confirmation of the first report of the Special Master.

On April 12, 1976, an inmate by the name of Juergens (140–270) was sentenced by the Rules Infraction Board to be transferred to maximum security. Commencing April 9, he spent four days in a regular correctional cell before leaving M.C.I. Prior time served in a correctional cell within six months of April 12 amounted to 30 days. Thus his total time served within six months was 34 days.

On June 21, 1976, an inmate by the name of Brownsword (144–171) was sentenced by the Rules Infraction Board to be transferred to maximum security. Commencing June 20 he served 12 days in a regular correctional cell. Immediately thereafter, he began to occupy a hospital correctional cell (ward 8) which he continued to occupy for 11 days. His total time served without interruption before his transfer to Southern Ohio Correctional Facility was effected amounted to 23 days.

These two violations of subparagraph 7(a) resulted from delays in obtaining permission to transfer a prisoner from M.C.I. to a maximum security institution. *Taylor v. Perini*, 413 F.Supp. 189, 236 (N.D.Ohio 1976). The Associate Superintendent for Custody has made special efforts to obtain speedy permission to transfer any inmate recommended for transfer to a maximum security institution, but a delay of at least several days (in order to allow the Superintendent to receive and decide the inmate's appeal) is inevitable. According to the Associate Superintendent for Custody, there have been several other instances of delay, but in these cases the inmate was incarcerated in a hospital ward (not a hospital correctional cell) where he was isolated but enjoyed full cell privileges.

Normal institutional meals, excepting desserts, extra sugar, extra salt, and extra pepper continue to be served to inmates incarcerated in correctional cells. A special list of inmates on medical diets is posted in the correctional cell area and special diets, to the extent that such are available to any inmate in the institution, are delivered to those inmates in correctional cells. Efforts apparently have been made to insure the preparation of diet meals for prisoners on special medical diets, but reports as to success have been mixed.

Regular toilets and sinks have been installed in the four correctional cells and two hospital correctional cells which formerly contained "oriental flush" facilities. A special toilet articles kit has been prepared by the institution and is given to each inmate at the time of his admission to a correctional cell. Each kit contains a toothbrush, toothpaste, soap and a washcloth.

Most correctional cell admissions occur during the first shift (8:00 a. m. to 4:00 p. m.), and occasional lapses in providing toilet articles have occurred on the second (4:00 p. m. to 12:00 a. m.) and third (12:00 a. m. to 8:00 a. m.) shifts. The Associate Superintendent for Custody has moved quickly to reprimand officers responsible for these failures and to inform all staff of the requirement. Unannounced inspections of the correctional cell areas by the Special Master and his Assistant have confirmed that adequate clothing and bedding are available on a regular basis.

A visitors' log maintained in the correctional cell area indicates that medical rounds are being made by a paramedical officer on each shift. The correctional officer assigned to the correctional cell area on all shifts is no longer responsible for any other area, although on several occasions the Special Master has found the correctional cells unattended because the officer in charge has been away. Apparently, however, virtually full-time coverage is maintained. Finally, it appears that the high noise level in the correctional cell area has abated to the point that inmates are now able to make their needs known to the correctional officer in charge.

A new and extremely effective method for the delivery of library books to inmates in correctional cells has been devised by the institution's new librarian, Mr. David Williams, and the correctional officer assigned to the library, Mr. Michael Ongalibang. A

long and expanding list of books held in the institution's library has been prepared; the list numbered some 1200 at last count by the Special Master. A copy of this list is made available to every inmate incarcerated in a correctional cell. The inmate may order up to three books from the list at one time, and delivery is made by a member of the library staff later that day. Orders are taken and delivered daily. Apart from textbooks, which are discussed below, no inmate incarcerated in a correctional cell is permitted to have any other books.

Copies of all textbooks utilized in any education course offered at the institution are available in the correctional cell area. Any inmate requesting such a book is provided with a copy for his use. As a result, no effort is made to retrieve textbooks for inmates from their personal belongings in their housing areas.

Normal mail privileges, apart from receipt of second and third class mail, continue to be made available to inmates incarcerated in correctional cells, and there is no evidence of any denial of access to such cells by clergymen, social services personnel or attorneys. In order to make certain that movable metal screens on cells in the lower north tier will not be used with the effect of casting a correctional cell into total darkness, the institution has caused all such screens to be welded to their frames. They are no longer operational in any manner. Finally, information reflected in a somewhat more comprehensible daily exercise log reflects that every inmate in the correctional cell area is permitted one hour every three days for a shower and exercise. There have been no reports from inmates contradicting these records.

## CONCLUSIONS AND RECOMMENDATIONS

■ On the basis of the information detailed above, the Special Master concludes that the institution is in good faith compliance with the requirements of Paragraph 7 of the Court's order. In spite of two instances of violation of subparagraph 7(a), the Special Master is convinced that the Associate Superintendent for Custody is making every reasonable effort to avoid such occurrences. Continued careful monitoring of this provision will be required, however. Because the correctional cell area constitutes a separate jail within the prison and the provisions of Paragraph 7 are wide ranging, occasional lapses on the part of staff are inevitable. All of the evidence obtained by the Special Master from staff, inmates, and institutional records indicates that the Associate Superintendent for Custody continues to strive for complete compliance with all of the requirements imposed by the Court in this paragraph of its order of September 12, 1972.

## PARAGRAPH 8

In the analysis of the institution's system of job assignment, promotion, transfer and removal in his first report, the Special Master concluded that "an underlying cause of many of the difficulties encountered in the area of job assignment and reassignment is the phenomenon of underemployment which exists in the institution at this time." *Taylor v. Perini*, 413 F.Supp. 189, 251 (N.D. Ohio 1976). At that time the number of inmates exceeded the estimated number of full-time jobs by 500 to 600. *Id.* Thus the practice of assigning all inmates to jobs resulted in extensive featherbedding. In order to attempt to reduce the extent of this phenomenon, the Special Master asked the Director of the Education Department at M.C.I. to prepare a plan for expanding the institution's educational program to absorb more inmates and in effect reduce the size of the labor force to which regular jobs must be assigned. This approach appeared to be more feasible than any effort to expand significantly the number of jobs.

The Director of the Department of Education, with the assistance of the Educational Administrator of the Department of Rehabilitation and Correction, prepared such a plan several weeks thereafter. Under this program 380 inmates will be engaged in full-time educational programs consisting of vocational, GED, College, and adult basic education. This compares to a

total of 118 presently engaged full-time in these programs. The net result will be 262 fewer inmates in need of regular jobs. The part-time high school program will continue to serve approximately 200 inmates, but these men will continue to be assigned to other jobs within the institution.

The proposal submitted to the Special Master projected a first year budget of $73,439. Early in June, 1976, the Director of the Department of Rehabilitation and Correction agreed to make this amount available, and on June 28, 1976, the Special Master was informed that funding was approved by the Controlling Board of the State of Ohio. The Director of the Department of Education at M.C.I. then began to interview and select staff for the five new positions called for in the proposal. As of August 24, 1976, all had been hired. The new full-time educational program is scheduled to begin on or before September 1, 1976.

So long as the population at M.C.I. remains at or below its current level, prospects for developing a rational, criteria related job assignment system are reasonably bright. Unfortunately, because of serious overcrowding in other correctional institutions in Ohio, this state of affairs is not likely to continue following the conclusion of this litigation. In the meantime, however, another favorable development has occurred in the locating of an automobile validation sticker plant at M.C.I., creating 53 additional full-time jobs.

Pending the outcome of negotiations with respect to the new full-time educational program described above, the Special Master deferred development of a plan of compliance to correct the deficiencies in the system of job assignment, promotion, transfer, and removal described in his first report. During this period, of course, assignments and reassignments have continued to be made by the appropriate institutional committees without the assistance of the Special Master. The following data reflect the current status of job assignments within the stockade. A total of 1124 inmates are accounted for out of a population of 1152 as of July 31, 1976; thus only 28 inmates have not been reported. In analyzing the following data, the Court should keep in mind that the stockade population consists of 44% white and 56% black inmates. This represents a slight increase in the proportion of white inmates over the past four months. The following figures should be compared to those contained in the first report of the Special Master. *Taylor v. Perini*, 413 F.Supp. 189, 242–245 (N.D. Ohio 1976).

| SHOP | JOB CATEGORY | | #BLACK | #WHITE | %BLACK | %WHITE |
|---|---|---|---|---|---|---|
| ADMINISTRATIVE PACKAGES | Carrier | | 0 | 1 | 0 | 100 |
| ARTS & CRAFTS | Clerk | | 0 | 1 | 0 | 100 |
| AUTOMOBILE BODY SCHOOL | Student | | 5 | 3 | 62.5 | 37.5 |
| | Porter | | 1 | 2 | 33 | 67 |
| | Clerk | | 1 | 3 | 25 | 75 |
| | | TOTAL | 7 | 8 | 47 | 53 |
| AUTOMOTIVE MECHANICS SCHOOL | Student | | 9 | 8 | 53 | 47 |
| | Clerk | | 0 | 1 | 0 | 100 |
| | Tool Room | | 0 | 2 | 0 | 100 |
| | Porter | | 1 | 1 | 50 | 50 |
| | | TOTAL | 10 | 12 | 45 | 55 |
| BARBERS | Dormitory | | 7 | 5 | 58 | 42 |
| | Cell Block | | 3 | 3 | 50 | 50 |
| | | TOTAL | 10 | 8 | 56 | 44 |

| SHOP | JOB CATEGORY | #BLACK | #WHITE | %BLACK | %WHITE |
|---|---|---|---|---|---|
| CAFETERIA | Floor workers | 5 | 11 | 31 | 69 |
| (Stockade) | Floor tank workers | 6 | 0 | 100 | 0 |
| | Serving line | 10 | 6 | 63 | 37 |
| | Menu Board | 1 | 1 | 50 | 50 |
| | Coffee makers | 2 | 0 | 100 | |
| | Set-up workers | 1 | 1 | 50 | 50 |
| | Bread room workers | 1 | 1 | 50 | 50 |
| | Diet kitchen workers | 0 | 4 | 0 | 100 |
| | Pot & Grill workers | 2 | 3 | 40 | 60 |
| | Pan room workers | 6 | 2 | 75 | 25 |
| | Dishroom workers | 12 | 2 | 86 | 14 |
| | Garbage dock | 4 | 0 | 100 | 0 |
| | Creamery workers | 0 | 4 | 0 | 100 |
| | Cooks | 14 | 8 | 64 | 36 |
| | Porters | 6 | 4 | 60 | 40 |
| | Sugar server | 0 | 1 | 0 | 100 |
| | Maintenance | 0 | 1 | 0 | 100 |
| | Refrigeration | 0 | 1 | 0 | 100 |
| | Extra help | 6 | 1 | 86 | 14 |
| | Men in court | 2 | 2 | 50 | 50 |
| | Men in hospital | 1 | 0 | 100 | 0 |
| | Office clerks | 2 | 2 | 50 | 50 |
| | Clothing room | 1 | 0 | 100 | 0 |
| | Ice cream worker | 0 | 1 | 0 | 100 |
| | Store room workers | 0 | 2 | 0 | 100 |
| | Officers cafe workers | 3 | 2 | 60 | 40 |
| | Vegetable room workers | 1 | 5 | 17 | 83 |
| | Bakery shop | 4 | 4 | 50 | 50 |
| | Butcher shop | 3 | 8 | 27 | 73 |
| | Silverware and cups | 1 | 1 | 50 | 50 |
| | Night cleaners | 3 | 1 | 75 | 25 |
| | TOTAL | 97 | 79 | 55 | 45 |
| CAPTAIN'S OFFICE | Clerk | 1 | 2 | 33 | 67 |
| CARPENTER SHOP | Carpenter | 1 | 3 | 25 | 75 |
| | Carpenter helper | 4 | 4 | 50 | 50 |
| | Chair repair | 0 | 1 | 0 | 100 |
| | Porter | 1 | 2 | 33 | 67 |
| | TOTAL | 6 | 10 | 37.5 | 62.5 |
| CHAPEL | Clerk (Catholic) | 0 | 2 | 0 | 100 |
| | Clerk (Protestant) | 0 | 2 | 0 | 100 |
| | Porter | 1 | 0 | 100 | 0 |
| | TOTAL | 1 | 4 | 20 | 80 |
| CLERKS (Housing areas) | Dormitory | 11 | 4 | 73 | 27 |
| | Cell Block | 1 | 5 | 17 | 83 |
| | TOTAL | 12 | 9 | 57 | 43 |
| COMMISSARY | Clerk | 4 | 5 | 44 | 55 |
| | Radio/TV repair | 0 | 2 | 0 | 100 |
| | TOTAL | 4 | 7 | 36 | 64 |

| SHOP | JOB CATEGORY | | #BLACK | #WHITE | %BLACK | %WHITE |
|---|---|---|---|---|---|---|
| CUSTODIAL SCHOOL | Day hall porters | | 9 | 5 | 64 | 36 |
| (Hall Porters) | Night hall porters | | 7 | 3 | 70 | 30 |
| | Shop area | | 5 | 4 | 56 | 44 |
| | Work crew | | 4 | 1 | 80 | 20 |
| | Semi-honor office | | 8 | 2 | 80 | 20 |
| | Office porters | | 10 | 6 | 63 | 37 |
| | | TOTAL | 43 | 21 | 67 | 33 |
| DENTAL CLINIC | Clinic | | 0 | 2 | 0 | 100 |
| | Dental lab | | 0 | 3 | 0 | 100 |
| | | TOTAL | 0 | 5 | 0 | 100 |
| DEPUTY'S OFFICE | Clerks | | 2 | 2 | 50 | 50 |
| | Clerk/runner | | 2 | 2 | 50 | 50 |
| | | TOTAL | 4 | 4 | 50 | 50 |
| EDUCATION OFFICE | Newsletter editor | | 0 | 1 | 0 | 100 |
| | Clerk | | 2 | 4 | 33 | 67 |
| | Porter | | 6 | 2 | 75 | 25 |
| | | TOTAL | 8 | 7 | 53 | 47 |
| ELECTRIC SHOP | Motor repair | | 0 | 1 | 0 | 100 |
| | Clerk/porter | | 0 | 1 | 0 | 100 |
| | Electrician | | 1 | 1 | 50 | 50 |
| | Electrician's helper | | 2 | 5 | 29 | 71 |
| | | TOTAL | 3 | 8 | 27 | 73 |
| FIRE INSPECTOR* | Inspector | | 1 | 2 | 33 | 67 |
| FURNITURE FACTORY | Office clerk | | 0 | 1 | 0 | 100 |
| | Storeroom clerk | | 1 | 0 | 100 | 0 |
| | Porters | | 4 | 3 | 57 | 43 |
| | Maintenance | | 0 | 2 | 0 | 100 |
| | Machine operators saw | | 4 | 2 | 67 | 33 |
| | Machine operators planer | | 1 | 2 | 33 | 67 |
| | Machine operators glue wheel | | 3 | 0 | 100 | 0 |
| | Machine operators shaper | | 2 | 0 | 100 | 0 |
| | Machine operators router | | 1 | 0 | 100 | 0 |
| | Machine operators sander | | 2 | 0 | 100 | 0 |
| | Vertical drill press | | 0 | 1 | 0 | 100 |
| | Spray booth | | 2 | 1 | 67 | 33 |
| | Machine helpers | | 1 | 6 | 14 | 86 |
| | Chair & desk assemblers | | 9 | 18 | 33 | 67 |
| | Hand sanders | | 7 | 1 | 87 | 13 |
| | | TOTAL | 37 | 37 | 50 | 50 |
| GARMENT SHOP | Sewing machine operators | | 7 | 6 | 54 | 46 |
| | Mechanic | | 0 | 1 | 0 | 100 |
| | Lineman | | 0 | 1 | 0 | 100 |
| | Cutter | | 1 | 1 | 50 | 50 |
| | Clerk | | 0 | 1 | 0 | 100 |
| | Trimmer | | 4 | 2 | 67 | 33 |
| | Porter | | 2 | 0 | 100 | 0 |
| | | TOTAL | 14 | 12 | 54 | 46 |

* Referred to as "Safety" in first report, Taylor v. Perini, 413 F.Supp. 189, 245 (N.D. Ohio 1976).

| SHOP | JOB CATEGORY | #BLACK | #WHITE | %BLACK | %WHITE |
|------|-------------|--------|--------|--------|--------|
| IDENTIFICATION | Darkroom | 2 | 3 | 40 | 60 |
| | Photographer | 0 | 3 | 0 | 100 |
| | Clerk | 3 | 1 | 75 | 25 |
| | Runner | 1 | 1 | 50 | 50 |
| | Porter | 1 | 2 | 33 | 67 |
| | TOTAL | 7 | 10 | 41 | 59 |
| INFIRMARY** | Medical Aides | 5 | 12 | 29 | 71 |
| | Clerks | 2 | 6 | 25 | 75 |
| | Runners | 1 | 0 | 100 | 0 |
| | Lab man | 0 | 1 | 0 | 100 |
| | X-ray technician | 0 | 1 | 0 | 100 |
| | X-ray trainee | 0 | 1 | 0 | 100 |
| | Laundryman | 1 | 0 | 100 | 100 |
| | Porters | 17 | 4 | 81 | 19 |
| | TOTAL | 26 | 25 | 51 | 49 |
| INMATE LIAISON OFFICE | Clerk | 0 | 1 | 0 | 100 |
| INMATE PERSONNEL | Clerks | 2 | 4 | 33 | 67 |
| INSTITUTION STOREROOM | Clerks | 2 | 1 | 67 | 33 |
| | Storeroom | 0 | 1 | 0 | 100 |
| | Porters | 1 | 1 | 50 | 50 |
| | Dock workers | 4 | 6 | 40 | 60 |
| | TOTAL | 7 | 9 | 44 | 56 |
| LAUNDRY | Washer Operators | 2 | 0 | 100 | 0 |
| | Washer pullers | 3 | 0 | 100 | 0 |
| | Extractor operators | 1 | 3 | 25 | 75 |
| | Dryer operators | 0 | 2 | 0 | 100 |
| | Buck pressers | 9 | 1 | 90 | 10 |
| | Clothing room | 0 | 3 | 0 | 100 |
| | Maintenance | 0 | 1 | 0 | 100 |
| | Porters | 2 | 0 | 100 | 0 |
| | Clerk/runner | 0 | 1 | 0 | 100 |
| | Runners | 1 | 1 | 50 | 50 |
| | Mangle & sheet shakeout | 9 | 8 | 53 | 47 |
| | NIGHT LAUNDRY | | | | |
| | Washer, puller, extractor | 4 | 1 | 80 | 20 |
| | Buck presser | 8 | 1 | 89 | 11 |
| | Steam presser | 1 | 0 | 100 | 0 |
| | Clerk/runner | 1 | 0 | 100 | 0 |
| | Officers' clothing | 0 | 1 | 0 | 100 |
| | Dry cleaner operator | 0 | 1 | 0 | 100 |
| | TOTAL | 41 | 24 | 63 | 37 |

** Referred to as "hospital" in first report, Taylor v. Perini, 413 F. Supp. 189, 243 (N.D. Ohio 1976).

| SHOP | JOB CATEGORY | #BLACK | #WHITE | %BLACK | %WHITE |
|------|-------------|--------|--------|--------|--------|
| LIBRARY | Record clerk | 0 | 1 | 0 | 100 |
| | Audio-visual | 0 | 1 | 0 | 100 |
| | Circulation clerk | 0 | 1 | 0 | 100 |
| | Typing clerk | 1 | 0 | 100 | 0 |
| | Shelf clerk | 0 | 1 | 0 | 100 |
| | Law clerk | 1 | 2 | 33 | 67 |
| | Porter | 2 | 0 | 100 | 0 |
| | TOTAL | 4 | 6 | 40 | 60 |
| MAINTENANCE | Clerk | 0 | 1 | 0 | 100 |
| | Heating serviceman | 0 | 1 | 0 | 100 |
| | Furnace & elevator repair | 0 | 1 | 0 | 100 |
| | Refrigerator maintenance | 0 | 2 | 0 | 100 |
| | Masonry repair | 2 | 2 | 50 | 50 |
| | Cafeteria maintenance | 0 | 2 | 0 | 100 |
| | Maintenance repair | 1 | 0 | 100 | 0 |
| | Laundry maintenance | 0 | 1 | 0 | 100 |
| | TOTAL | 3 | 10 | 23 | 77 |
| MASONRY SCHOOL | Student | 17 | 3 | 85 | 15 |
| | Clerk | 1 | 0 | 100 | 0 |
| | Porter | 2 | 1 | 67 | 33 |
| | TOTAL | 20 | 4 | 83 | 17 |
| NEWGATE COLLEGE PROGRAM | Full time students | 32 | 11 | 74 | 26 |
| PAINT SHOP | Clerk | 0 | 1 | 0 | 100 |
| | Glazer | 0 | 1 | 0 | 100 |
| | Glazer helper | 0 | 1 | 0 | 100 |
| | Painter | 5 | 3 | 62 | 38 |
| | Painter's helper | 1 | 2 | 33 | 67 |
| | Sign painter | 1 | 1 | 50 | 50 |
| | TOTAL | 7 | 9 | 44 | 56 |
| PLUMBING SHOP | Clerk | 1 | 0 | 100 | 0 |
| | Lift station | 0 | 1 | 0 | 100 |
| | Welder | 0 | 1 | 0 | 100 |
| | Plumber | 5 | 4 | 56 | 44 |
| | Porter | 1 | 0 | 100 | 0 |
| | TOTAL | 7 | 6 | 54 | 46 |
| PORTERS (Housing areas) | 1 Cellblock | 2 | 2 | 50 | 59 |
| | 2 Cellblock | 2 | 1 | 67 | 33 |
| | 3 Cellblock | 2 | 3 | 40 | 60 |
| | 4 Cellblock | 1 | 3 | 25 | 75 |
| | 5 Cellblock | 2 | 2 | 50 | 50 |
| | 6 Cellblock | 1 | 2 | 33 | 67 |

| SHOP | JOB CATEGORY | #BLACK | #WHITE | %BLACK | %WHITE |
|------|-------------|--------|--------|--------|--------|
| PORTERS (Housing areas) (continued | | | | | |
| | 1 dorm | 4 | 0 | 100 | 0 |
| | 1A dorm | 4 | 0 | 100 | 0 |
| | 2 dorm | 6 | 0 | 100 | 0 |
| | 2B dorm | 4 | 0 | 100 | 0 |
| | 3 dorm | 4 | 1 | 80 | 20 |
| | 3C dorm | 3 | 1 | 75 | 25 |
| | 4 dorm | 5 | 0 | 100 | 0 |
| | 4D dorm | 4 | 2 | 67 | 33 |
| | 5 dorm | 1 | 3 | 25 | 75 |
| | 5E dorm | 2 | 1 | 67 | 33 |
| | 6 dorm | 4 | 1 | 80 | 20 |
| | 6F dorm | 1 | 4 | 20 | 80 |
| | TOTAL | 52 | 26 | 67 | 33 |
| PRINT SHOP | | | | | |
| | Workers | 2 | 1 | 67 | 33 |
| | Student | 0 | 1 | 0 | 100 |
| | TOTAL | 2 | 2 | 50 | 50 |
| PROGRAM OFFICE CLERKS | | | | | |
| | Jaycee office | 1 | 0 | 100 | 0 |
| | A.A. office | 0 | 1 | 0 | 100 |
| | 7 steps office | 0 | 1 | 0 | 100 |
| | TOTAL | 1 | 2 | 33 | 67 |
| PSYCHOLOGICAL SERVICES | | | | | |
| | Typists/clerks | 3 | 0 | 100 | 0 |
| | Runner | 1 | 0 | 100 | 0 |
| | TOTAL | 4 | 0 | 100 | 0 |
| QUARTERMASTER | | | | | |
| | Clerks | 1 | 1 | 50 | 50 |
| | Outside clothing tailor | 0 | 1 | 0 | 100 |
| | H.D., cafe., hosp. clothing | 1 | 0 | 100 | 0 |
| | Counter clerks | 2 | 2 | 50 | 50 |
| | Tailors | 3 | 0 | 100 | 0 |
| | Clothing repair | 3 | 0 | 100 | 0 |
| | Shoe shop | 1 | 0 | 100 | 0 |
| | Presser | 1 | 0 | 100 | 0 |
| | Porters | 3 | 1 | 75 | 25 |
| | TOTAL | 15 | 5 | 75 | 25 |
| RADIO & T.V. SCHOOL | Students | 4 | 8 | 33 | 67 |
| | Maintenance | 1 | 1 | 50 | 50 |
| | Porter | 0 | 1 | 0 | 100 |
| | TOTAL | 5 | 10 | 33 | 67 |
| RECREATION | Office clerk | 2 | 1 | 67 | 33 |
| | Office porter | 2 | 0 | 100 | 0 |
| | Equipment room | 2 | 0 | 100 | 0 |
| | First aid room | 0 | 1 | 0 | 100 |
| | Yard gang | 36 | 39 | 48 | 52 |
| | TOTAL | 42 | 41 | 51 | 49 |

| SHOP | JOB CATEGORY | | #BLACK | #WHITE | %BLACK | %WHITE |
|---|---|---|---|---|---|---|
| RESIDENTIAL WIRING SCHOOL | | | | | | |
| | Student | | 5 | 2 | 71 | 29 |
| | Clerks | | 1 | 1 | 50 | 50 |
| | Porter | | 1 | 0 | 100 | 0 |
| | | TOTAL | 7 | 3 | 70 | 30 |
| | | | | | | |
| SHEET METAL | Wash tanks | | 4 | 0 | 100 | 0 |
| | Shears | | 1 | 3 | 25 | 75 |
| | Toolroom mechanic | | 0 | 1 | 0 | 100 |
| | Spray painter | | 6 | 0 | 100 | 0 |
| | Clerks | | 1 | 1 | 50 | 50 |
| | Porters | | 0 | 6 | 0 | 100 |
| | Punch press | | 1 | 1 | 50 | 50 |
| | Break press | | 1 | 3 | 25 | 75 |
| | Cabinet assemblies | | 9 | 0 | 100 | 0 |
| | Utility | | 2 | 2 | 50 | 50 |
| | Grinder | | 2 | 1 | 67 | 33 |
| | Chair assembly | | 1 | 4 | 20 | 80 |
| | Cut-off saw | | 0 | 2 | 0 | 100 |
| | Bender | | 1 | 0 | 100 | 0 |
| | Drill press | | 1 | 0 | 100 | 0 |
| | Welder | | 1 | 2 | 33 | 67 |
| | | TOTAL | 31 | 26 | 54 | 46 |
| | | | | | | |
| SOCIAL SERVICES | Clerks | | 4 | 1 | 80 | 20 |
| | Clerk/typist | | 0 | 3 | 0 | 100 |
| | | TOTAL | 4 | 4 | 50 | 50 |
| | | | | | | |
| TOOL ROOM | Clerk | | 0 | 1 | 0 | 100 |
| | Counterman | | 1 | 0 | 100 | 0 |
| | Porter | | 3 | 2 | 60 | 40 |
| | Locksmith | | 0 | 1 | 0 | 100 |
| | Repairman | | 0 | 3 | 0 | 100 |
| | | TOTAL | 4 | 7 | 36 | 64 |
| | | | | | | |
| TRASH RUN | Trash crew | | 7 | 1 | 88 | 12 |
| | | | | | | |
| TREATMENT OFFICE | Clerk | | 0 | 1 | 0 | 100 |
| | | | | | | |
| TRAINING OFFICE | Clerk | | 0 | 1 | 0 | 100 |
| | | | | | | |
| WELDING SCHOOL | Student | | 11 | 6 | 65 | 35 |
| | Clerks | | 0 | 3 | 0 | 100 |
| | Porters | | 0 | 2 | 0 | 100 |
| | Maintenance | | 0 | 1 | 0 | 100 |
| | | TOTAL | 11 | 12 | 48 | 52 |
| | | | | | | |
| YARD GANG | Yard gang | | 19 | 9 | 68 | 32 |
| | | | | | | |
| ALL JOBS | | TOTAL | 618 | 506 | | |

---

Analysis of this data demonstrates that while progress has been made with respect to some employment units, the present system of job assignment and reassignment continues to have a racially discriminatory effect. The garment shop, formerly 100%

white, is now 54% black. The percentage of whites in the maintenance shop has decreased slightly from 87% to 77%, and percentages of whites in the paint shop and the automobile mechanics school[1] has decreased from 69% to 56% and from 63% to 53% respectively. On the other hand, percentages of blacks in the quartermaster department (75%), the masonry school[1] (83%), and the residential wiring school[1] (70%) remain disproportionately high and roughly unchanged from those reported earlier. In addition, individual job assignments within certain employment units remain unbalanced. For example, all four wash tank operators and all nine cabinet assemblers in the sheet metal shop remain black.

As of July 31, 1976, the total population in the honor dormitory was 202, of which 39% were white and 61% were black. The following data identify job assignments for 215[2] inmates housed in that unit. These figures should be compared to those contained in the first report of the Special Master. *Taylor v. Perini*, 413 F.Supp. 189, 246 (N.D.Ohio 1976).

| SHOP | JOB CATEGORY | #BLACK | #WHITE | %BLACK | %WHITE |
|---|---|---|---|---|---|
| CAFETERIA (H.D.) | Cooks | 5 | 1 | 83 | 17 |
| | Floor man | 1 | 1 | 50 | 50 |
| | Kitchen cleaner | 0 | 1 | 0 | 100 |
| | Night porter | 0 | 1 | 0 | 100 |
| | Day porter | 1 | 0 | 100 | 0 |
| | Pots & pans | 2 | 0 | 100 | 0 |
| | Tray machine | 1 | 0 | 100 | 0 |
| | Vegetable man | 1 | 0 | 100 | 0 |
| | TOTAL | 11 | 4 | 73 | 27 |
| CLARK'S GARDEN GANG | Waterboy | 1 | 0 | 100 | 0 |
| | Laborer | 11 | 3 | 79 | 21 |
| | TOTAL | 12 | 3 | 80 | 20 |
| COY'S TRACTOR GANG | Tractor driver | 4 | 5 | 44 | 56 |
| | Mechanic | 0 | 1 | 0 | 100 |
| | TOTAL | 4 | 6 | 40 | 60 |
| DAIRY BARN | Clerk | 1 | 0 | 100 | 0 |
| | Feeder | 2 | 0 | 100 | 0 |
| | Truck driver | 0 | 2 | 0 | 100 |
| | Washes milker | 1 | 0 | 100 | 0 |
| | Calf barn | 0 | 2 | 0 | 100 |
| | Chore men | 1 | 2 | 33 | 67 |
| | Milker | 6 | 1 | 86 | 14 |
| | Laborer | 4 | 2 | 67 | 33 |
| | Night man | 1 | 0 | 100 | 0 |
| | TOTAL | 16 | 9 | 64 | 36 |

1. Federally financed vocational school programs. Special criteria for these jobs have been established by the Office of Manpower Development. See *First Report of the Special Master* in *Taylor v. Perini*, 413 F.Supp. 189, 248 (N.D.Ohio 1976).

2. That the data account for more inmates than are indicated as living in the honor dormitory is explained by the fact that total population is reported to the Special Master at the end of each month. The population level at the honor dormitory fluctuates weekly, and reached very high levels in June and July when some of the job assignment reports were prepared for the Special Master by job supervisors.

| SHOP | JOB CATEGORY | #BLACK | #WHITE | %BLACK | %WHITE |
|------|-------------|--------|--------|--------|--------|
| HOG LOT | Night man | 1 | 2 | 33 | 67 |
| | Feeds sows | 1 | 0 | 100 | 0 |
| | Barn #2 | 1 | 0 | 100 | 0 |
| | Tractor driver | 0 | 1 | 0 | 100 |
| | "Where & if needed" | 3 | 3 | 50 | 50 |
| | TOTAL | 6 | 6 | 50 | 50 |
| M.C.I. GARAGE | Dispatcher | 1 | 0 | 100 | 0 |
| | Mechanic | 0 | 1 | 0 | 100 |
| | Heavy equip. mech. | 1 | 0 | 100 | 0 |
| | Wash rack man | 1 | 0 | 100 | 0 |
| | Fire department | 2 | 0 | 100 | 0 |
| | Licensed drivers | 4 | 1 | 80 | 20 |
| | Unlicensed drivers | 0 | 2 | 0 | 100 |
| | TOTAL | 9 | 4 | 69 | 31 |
| HONOR DORMITORY HELP | Clerk | 0 | 2 | 0 | 100 |
| | Porters | 2 | 3 | 40 | 60 |
| | Maintenance | 0 | 1 | 0 | 100 |
| | Cleaners | 3 | 0 | 100 | 0 |
| | Barber | 1 | 0 | 100 | 0 |
| | Helper | 1 | 0 | 100 | 0 |
| | Clothing room | 1 | 0 | 100 | 0 |
| | Nurse | 1 | 0 | 100 | 0 |
| | Social services clerk | 1 | 0 | 100 | 0 |
| | Maintenance | 0 | 1 | 0 | 100 |
| | H.D. yard | 4 | 1 | 80 | 20 |
| | Library maintenance | 1 | 0 | 100 | 0 |
| | Trash truck | 2 | 1 | 67 | 33 |
| | Visiting room set-up | 2 | 0 | 100 | 0 |
| | TOTAL | 19 | 9 | 68 | 32 |
| NEWLAND'S FARM GANG | Gang waterboy | 1 | 0 | 100 | 0 |
| | Gang worker | 3 | 1 | 75 | 25 |
| | TOTAL | 4 | 1 | 80 | 20 |
| O.P.I. WAREHOUSE | Truck driver | 0 | 2 | 0 | 100 |
| | Storekeeper | 1 | 0 | 100 | 0 |
| | TOTAL | 1 | 2 | 33 | 67 |
| POWER PLANT | Fireman's helper | 1 | 2 | 33 | 67 |
| | Maintenance helper | 1 | 0 | 100 | 0 |
| | Chemist | 0 | 1 | 0 | 100 |
| | Clerk | 0 | 1 | 0 | 100 |
| | Coal and ash | 6 | 1 | 86 | 14 |
| | Porter | 2 | 0 | 100 | 0 |
| | Yardman | 0 | 1 | 0 | 100 |
| | TOTAL | 10 | 6 | 62 | 38 |
| SALLYPORT | Runner | 0 | 2 | 0 | 100 |
| | Gate pusher | 3 | 0 | 100 | 0 |
| | TOTAL | 3 | 2 | 60 | 40 |
| WAGNER'S FARM GANG | Waterboy | 1 | 0 | 100 | 0 |
| | Gang worker | 10 | 3 | 77 | 23 |
| | TOTAL | 11 | 3 | 79 | 21 |

| SHOP | JOB CATEGORY | #BLACK | #WHITE | %BLACK | %WHITE |
|---|---|---|---|---|---|
| WITZEL'S FARM GANG | Farm clerks | 0 | 2 | 0 | 100 |
| | Yard bed-hot bed | 0 | 1 | 0 | 100 |
| | Grainery feed mixer | 1 | 1 | 50 | 50 |
| | Dump man | 1 | 0 | 100 | 0 |
| | Carpenter-truck driver | 0 | 1 | 0 | 100 |
| | TOTAL | 2 | 5 | 29 | 71 |
| VALIDATION | Maintenance | 0 | 1 | 0 | 100 |
| | Clerk | 1 | 0 | 100 | 0 |
| | Printing press | 3 | 3 | 50 | 50 |
| | Cutter operators | 2 | 2 | 50 | 50 |
| | Bagging machine | 8 | 3 | 73 | 27 |
| | Inspectors | 3 | 2 | 60 | 40 |
| | Shipping | 2 | 1 | 67 | 33 |
| | Oven operator | 1 | 1 | 50 | 50 |
| | Janitors | 2 | 0 | 100 | 0 |
| | TOTAL | 22 | 13 | 63 | 37 |
| YARDMEN | Yardmen | 8 | 4 | 67 | 33 |
| ALL JOBS | TOTAL | 138 | 77 | | |

Again, some improvement in racial balance has been made in certain areas. Whereas 89% of the tractor drivers on Coy's Tractor Gang and 89% of the "where and if needed" employees in the hog lot were white at the time of the submission of the Special Master's first report, these figures have fallen to 56% and 50% respectively. On the other hand, several areas have not improved and continue to reflect the discriminatory effect of present assignment and reassignment procedures. For example, 86% of the ash crew at the power plant remain black, as do 79% of Clark's garden gang laborers.

Procedures utilized for job assignment, transfer, promotion, and removal remain essentially unchanged from those reported earlier by the Special Master. In order to accomplish the task of preparing precisely worded, job related substantive criteria for all inmate jobs, the Special Master has retained the services of Professor Timothy Heinsz of The University of Toledo College of Law. Professor Heinsz, in the course of his practice and teaching of labor law, has had extensive experience in constructing and evaluating job descriptions employed in private and public industry. Job supervisors at M.C.I. have been asked to prepare descriptions of all jobs under their jurisdiction and to submit these to the Special Master. While a number of these have been received, a good many remain outstanding.

The institution itself has attempted to deal with several problems pointed out in the first report of the Special Master. For example, Superintendent Perini advised all job supervisors in July that the practice of "loaning" or "borrowing" inmates (and thus effecting inter-shop transfers) constituted a violation of the Court's order which requires that all such transfers be made by persons or committees with centralized responsibility for making those assignments. In addition a method has been developed to keep the Reclassification Committee and the Honor Dormitory Reclassification Committee informed of intra-shop transfers by job supervisors. The proposal calls for the reporting of all intra-shop transfers to the appropriate committee at periodic intervals, and all such transfers will be subject to committee approval. The proposed system appears to be well designed to deal with the problem of unsupervised intra-shop transfers detailed in the first report of the Spe-

cial Master. Finally, the Reclassification Committee has begun to review all stockade inmate job assignments on an annual basis. Between May 5, 1976 and July 22, 1976, a total of 296 stockade inmates were reviewed, resulting in job changes for 11 inmates. In almost every case, the reason given for failing to make a new job assignment was that the inmate was satisfied on his current job. Seventy-four inmates were reviewed by the Reclassification Committee on May 5, 1976. The average job tenure reflected by the report of that meeting was 30.9 months. One inmate had held the same job for 103 months. Twenty-nine honor dormitory inmates have been reviewed by the Honor Dormitory Reclassification Committee, but no job changes occurred as a result of those annual reviews.

Data submitted by the job assignment committees since the confirmation of the first report of the Special Master indicate that the wishes of inmates and job supervisors continue to play an important role in the decisions of those committees. Disciplinary job changes continue to occur, but these appear to be based upon job related rule infractions. In one case a Rules Infraction Board recommendation for a job change was denied by the Reclassification Committee because it found that the rule infraction was not job related. Finally, it is clear that inmates' requests for reassignment are being denied in significant numbers because of problems of racial imbalance in the employment unit to which the inmate is seeking to be transferred.

## CONCLUSIONS AND RECOMMENDATIONS

With the implementation of the full-time education program described above, it will be possible to develop a rational, criteria related system for the assignment, promotion, transfer, and removal of inmates to and from job assignments. The first step must be the development of precisely worded, job related substantive criteria for job assignment, transfer, and removal. The development of these criteria will require increased cooperation on the part of all job supervisors in the institution.

In the opinion of the Special Master, an effective annual review of all inmate assignments will satisfy the requirement that transfers "not be dependent upon the self-initiative of inmates." The results of the annual review procedure recently instituted indicate that the number of job transfers resulting from the process will be small if inmates who are satisfied with their job assignments are permitted to remain on the same job indefinitely. The administration of the institution has argued strongly that recommendations from job supervisors should be taken into account in assigning inmates to particular jobs, and they seek an interpretation of subparagraph 8(d)(2) which will permit a request for a particular inmate from a job supervisor to be one (though not a controlling) factor to be considered by the assigning committee. In the opinion of the Special Master, the Court's language on this subject plainly forbids any input by job supervisors other than submission of "precisely worded, job related substantive criteria." Unless he is informed to the contrary, the Special Master will proceed accordingly in the development of a plan of compliance.

## PARAGRAPH 9

Assignments and reassignments made by the various job assignment committees since the confirmation of the first report of the Special Master have had mixed effect upon the employment units singled out by the Court in its order of September 12, 1972. The following figures should be compared to those contained in that earlier report. *Taylor v. Perini*, 413 F.Supp. 189, 252–253 (N.D.Ohio 1976). Since all data relate only to the stockade, the population breakdown of 56% black and 44% white should be kept in mind.

*Office Workers:* Reports received from job supervisors show that 52 office worker positions are held by blacks and 69 by whites. Thus 43% of these positions are assigned to blacks and 57% to whites. This compares to 42% and 58% respectively at the time of the last report of the Special Master.

*Porters:* Somewhat greater improvement has occurred with respect to porter jobs. Of 176 such positions reported by job supervisors, 113 are held by blacks and 63 by whites. Thus 64% of all stockade porters are black and 36% are white. This compares with 69% and 31% respectively at the time of the last report of the Special Master.

*Plumbing Shop:* Data reported on page 761 *supra* show that seven plumbing shop jobs are held by blacks and six by whites. Thus 54% of all such positions are filled by blacks and 46% by whites. This constitutes a substantial improvement over earlier percentages of 43% black and 57% white.

*Electric Shop:* Data reported on page 759 *supra* show that three positions in the Electric Shop are held by blacks and eight by whites. The proportion of 27% black and 73% white is unchanged from that reported earlier.

*Carpenter Shop:* Data reported on page 758 *supra* show that six inmate employees in this shop are black and ten are white. The percentage breakdown is 37.5% black and 62.5% white, which represents a more pronounced imbalance than earlier reported percentages of 40% and 60% respectively.

*Commissary:* Data reported on page 758 *supra* show that four blacks and seven whites are employed in this unit. The percentage of blacks is 36% and that of whites is 64%. These percentages are unchanged from those reported earlier.

*Hospital:* This unit is referred to as the infirmary on page 760 *supra.* Those data reflect 26 black and 25 white inmate/employees. The percentage breakdown is 51% black and 49% white. This appears to be a significant improvement over earlier reported percentages of 41.5% black and 58.5% white. The impression is illusory, however, in view of the fact that 17 blacks are employed as porters (as compared to four whites) and 21 whites are employed in non-porter jobs (as compared to nine blacks).

*Dental Clinic:* According to data on page 759 *supra* all five inmates employed in the Dental Clinic are white. There has been no change in the racial composition of this employment unit since the first report of the Special Master.

*Cafeteria:* Data on page 758 *supra* report 97 blacks and 79 whites employed in the stockade cafeteria. Thus 55% of such employees are black and 45% are white. This represents a substantial improvement over earlier percentages of 61% and 39% respectively. Internal assignments within the cafeteria, however, reflect racial imbalance in such jobs as floor tank workers, diet kitchen workers, dishroom workers, the garbage dock, vegetable room workers, and the butcher shop.

*Laundry:* Data reported on page 760 *supra* show 41 black and 24 white laundry workers. The percentages are 63% black and 37% white. This represents a slight improvement over earlier percentages of 64% and 36% respectively. Again, however, intra-shop assignments reflect significant racial imbalance in several job areas.

*Trash Run:* According to data on page 763 *supra* seven jobs in this employment unit are held by blacks and one by a white. The percentage breakdown is 88% and 12%. Racial imbalance in this unit has increased. Earlier percentages were 67% black and 33% white.

*Custodial School:* Data on page 759 reflect 43 blacks and 21 whites employed in the Custodial School. The percentages of 67% black and 33% white are unchanged from those reported earlier.

## CONCLUSIONS AND RECOMMENDATIONS

■ The effects of past discrimination have been rectified in only one of the employment units specified in Paragraph 9 of the Court's order, the plumbing shop, where the racial balance approximates closely that in the stockade population as a whole. Black inmates continue to be underrepresented in office worker jobs, the electric shop, the carpenter shop, the commissary, non-porter jobs in the infirmary, selected areas in the cafeteria, and in the dental

clinic. Blacks are overrepresented in porter jobs, certain jobs in the laundry, the trash run, the custodial school, and in some job categories in the cafeteria.

The Special Master recommends that compliance with Paragraph 9 of the Court's order be defined in terms of achievement of racial balance in each of the affected employment units which reflects the racial balance of the overall stockade population allowing for a deviation factor of ±10%. In addition, fairer balance should be achieved with respect to intra-shop assignments in the hospital, the laundry, and the cafeteria. Under these standards, compliance has been achieved only in the plumbing shop and in porter jobs. Until compliance is achieved in the other employment units specified in this portion of the Court's order, it is the recommendation of the Special Master that no white inmates be assigned to office worker jobs, the electric shop, the carpenter shop, the commissary, non-porter jobs in the infirmary, or the dental clinic, and that no black inmates be assigned to the trash run or the custodial school. At the same time, steps should be taken to bring about more racially balanced intra-shop job distribution in the cafeteria and the laundry.

The Special Master further recommends that no inmate be transferred involuntarily from any of the employment units in which compliance has not been achieved solely in order to achieve better racial balance. Rather it is recommended that all employees of the race which is overrepresented in these employment units be interviewed by the Reclassification Committee in order to learn whether any such inmates desire to change jobs. In the event that any such inmate expresses a desire to leave a unit, he should be transferred and replaced by an inmate of the currently underrepresented race in that unit. At the end of this procedure, any further assignments needed to bring about a state of compliance should be made in the course of natural attrition brought about by inmates leaving the stockade or being transferred for reasons other than race.

## PARAGRAPH 10

Unlike the other portions of the Court's order of September 12, 1972, Paragraph 10 requires the assistance of outside experts in the development and implementation of plans of compliance. In order to obtain such assistance, the Special Master requested the Director of the Department of Rehabilitation and Correction to seek a $30,000 grant to support the research and other activities necessary for the effectuation of pre-hire screening and post-hire training of incoming correctional staff which are required by subparagraphs (c), (d), and (e) of Paragraph 10. The Department applied for such a grant from the Law Enforcement Assistance Administration, and authorization to obligate and spend funds was given on June 30, 1976. The total amount of the LEAA grant is $27,000; the Department of Rehabilitation and Correction is providing matching funds in the amount of $3000.

The Department of Rehabilitation and Correction has contracted with the Special Master for the accomplishment of the object of this grant. Although both the grant proposal and the contract between the Department and the Special Master track the language of subparagraph 10(d) relating to pre-hire psychological testing, all psychologists consulted about this project have agreed that pre-hire selection and post-hire training (the latter being mandated by subparagraphs 10(c) and 10(e)) are closely interrelated and will require simultaneous development and coordination in order to bring about the objective of a working atmosphere free of racial harassment, intimidation and insult required by the Court's order.

When it became clear that the Department would apply for and probably receive a grant to support this activity, the Special Master contacted a number of potential psychological consultants, and proposals were received from two groups. One of these was a university based team and the other a private psychological consulting firm located in Minneapolis, Minnesota. After careful consideration by the Court, the Special Master, and several outside ad-

visors, the private consulting firm, Personnel Decisions Research Institute, was selected. Subsequently the Special Master entered into a contract with that group for the purpose of developing pre-hire screening and post-hire training techniques for incoming staff members at M.C.I. Personnel Decisions Research Institute has agreed to (1) perform a task-oriented job analysis with respect to correctional officers employed by M.C.I., (2) perform a literature review with respect to pre-hire screening and post-hire training of correctional staff, (3) develop behavioral dimensions of correctional officer performance, (4) develop a tentative screening procedure for incoming correctional staff at M.C.I., (5) develop and attempt to validate a selection battery for incoming correctional staff at M.C.I., (6) construct an exit interview procedure for such staff, and (7) make recommendations for correctional officer training. The Institute has agreed to complete all services under this contract and to submit its final report on the project by June 30, 1977, which is the end of the LEAA grant period. In exchange, Personnel Decisions Research Institute will receive a fixed fee of $28,230. The remaining $1,770 in grant funds will be utilized to compensate a legal consultant who will provide input for the project on the subject of the requirements of Title VII of the Civil Rights Act of 1964.

Written staff rules and the sanctions for their violation which are mandated by subparagraph 10(a) of the Court's order will appear in a revision of the current Correctional Employees Reference Manual which is distributed to all incoming correctional officers at M.C.I. The Special Master has delegated this task to the institution's personnel officer and anticipates that the revised manual will be available in the Fall of 1976.

In his first report the Special Master found that language then utilized by the institution to meet the requirements of subparagraph 10(b) was insufficient to accomplish its intended purpose. *Taylor v. Perini*, 413 F.Supp. 189, 257 (N.D.Ohio 1976). The following language now appears on all staff position descriptions as well as on all employment application forms utilized by M.C.I.:

It is the firm policy of the Marion Correctional Institution to maintain a working atmosphere free of any discrimination on the basis of race, sex, religion and national origin. Discriminatory harassment, intimidation, or insult of staff, inmates or visitors to the institution will subject an employee to disciplinary action. The ability and willingness of an employee to abide by this policy and to refrain from such actions are *essential* requirements for employment. The employee's performance with respect to this policy will be evaluated regularly as a major criterion for determining retention and promotion.

The statement fails to mention salary determinations because neither the institution nor the Department has any control over an employee's salary apart from that over his retention and promotion. All initial salaries and all annual increments for continuing employees are fixed by state law.

No compliance plan has been developed with respect to subparagraph 10(f) which requires substantial changes in the current inmate orientation program employed at M.C.I. The Special Master has asked the Director of Social Services at M.C.I. to provide his ideas concerning the development of such a program, and a revised format for the inmate orientation program will be developed in the near future.

## CONCLUSIONS AND RECOMMENDATIONS

It is the conclusion of the Special Master that full compliance has been achieved with respect to subparagraph 10(b). All other portions of Paragraph 10 require further effort. With the cooperation of the necessary staff at M.C.I., compliance with subparagraphs 10(a) and 10(f) can be accomplished without undue difficulty or delay. Final recommendations with respect to subparagraphs 10(c), 10(d), and 10(e) must await the results of the efforts of the psychological consultants employed for those

tasks. With the appointment of the Special Master and the issuance of the Court's order of April 9, 1976, requiring that "all steps . . . to effectuate full compliance with (the Court's order of September 12, 1972) be supervised, coordinated and approved by the Special Master, acting for the Court", *Taylor v. Perini*, 413 F.Supp. 189, 193 (N.D.Ohio 1976), it appears that subparagraph 10(g) has been superseded. All institutional compliance efforts described in this report have been coordinated by Mr. W. J. Whealon, the Associate Superintendent for Treatment Services, who has provided liaison between the institution and the Special Master since the latter's appointment in December, 1975. In view of Mr. Whealon's recent appointment as Associate Superintendent for Treatment Services, it is no longer possible for this to constitute his primary job responsibility. Once full compliance is achieved, it is the opinion of the Special Master that the Superintendent of the institution should be the person responsible for maintaining a state of compliance in the future.

### PARAGRAPH 11

Since the Court's confirmation of the first report of the Special Master, the staff member responsible for making bed and lock assignments at M.C.I. has attempted to improve the racial balance of living units within the stockade. As of August 5, 1976, the racial configuration of all living units within the institution was the following:

| LIVING UNIT | # BLACK | # WHITE | % BLACK | % WHITE |
|---|---|---|---|---|
| 1 dormitory (cafeteria workers) | 36 | 23 | 61 | 39 |
| 1-A dormitory (cafeteria workers) | 40 | 24 | 62.5 | 37.5 |
| 2 dormitory | 44 | 15 | 75 | 25 |
| 2-B dormitory | 42 | 19 | 69 | 31 |
| 3 dormitory | 41 | 23 | 64 | 36 |
| 3-C dormitory | 47 | 17 | 73 | 27 |
| 4 dormitory | 46 | 13 | 78 | 22 |
| 4-D dormitory | 35 | 29 | 55 | 45 |
| 5 dormitory (Papillon) | 20 | 30 | 40 | 60 |
| 5-E dormitory (Papillon) | 24 | 26 | 48 | 52 |
| 6 dormitory | 41 | 22 | 65 | 35 |
| 6-F dormitory (quiet dorm) | 21 | 43 | 33 | 67 |
| 1 cellblock | 36 | 31 | 54 | 46 |
| 2 cellblock | 35 | 31 | 53 | 47 |
| 3 cellblock | 36 | 31 | 54 | 46 |
| 4 cellblock | 34 | 33 | 51 | 49 |

| LIVING UNIT | # BLACK | # WHITE | % BLACK | % WHITE |
|---|---|---|---|---|
| 5 cellblock | 35 | 32 | 52 | 48 |
| 6 cellblock (allotted cellblock) | 16 | 51 | 24 | 76 |
| Honor Dormitory North | 53 | 55 | 49 | 51 |
| Honor Dormitory East | 77 | 25 | 75 | 25 |

The institutional population ratio was the following, as of July 31, 1976:

### Main Stockade

| Black | White |
|---|---|
| 56% | 44% |

### Honor Dormitory

| | |
|---|---|
| 61% | 39% |

Thus white inmates continue to be significantly underassigned to dormitories in all but 4–D dormitory, 5 dormitory, 5–E dormitory, and 6–F dormitory. The latter three housing areas are somewhat special since inmates assigned to 5 and 5–E must have qualified for and been admitted to the Papillon drug rehabilitation program, and assignments to 6–F are made on the basis of the inmate's request for the "quiet" dormitory. Conversely, white inmates continue to be overassigned to the preferred cell block areas, and they are extremely heavily overassigned to 6 cellblock to which selected staff members have the privilege of assigning certain inmates. See Taylor v. Perini, 413 F.Supp. 189, 259 (N.D.Ohio 1976).

When these data are compared to those contained in the first report of the Special Master, Taylor v. Perini, 413 F.Supp. 189, 259 (N.D.Ohio 1976), it is apparent that the racial balance in most dormitories and cellblocks (within the main stockade) has improved. The percentage of white inmates has increased in dormitories 1, 1–A, 3, 4, 4–D, 5, 6, and 6–F. No change has occurred in 5–E and the percentage of whites has decreased in 2, 2–B, and 3–C. While the decrease in percentage of white inmates in 2 and 3–C dormitories is not justified by any circumstances brought to the attention of the Special Master, assignment to 2–B is based upon enrollment in the institution's college studies program.

The percentage of white inmates has decreased in all cellblocks other than 6 cellblock, in which the percentage of whites has increased since the confirmation of the Special Master's first report. The voluntary bed selection system in the honor dormitory continues in effect, but a slight improvement in racial balance has occurred in both bays of that facility.

The Special Master has agreed with institution officials that any effort to bring about immediate racial balance in dormitories and cellblocks within the stockade by moving large numbers of inmates involuntarily simply because they are of the "wrong" race would create chaos and a very

high degree of inmate resistance. The latter is confirmed by the Inmate Liaison Committee. Thus, such improvements as have occurred since April, 1976, have resulted from efforts to assign white inmates to dormitories and black inmates to cellblocks as openings have occurred.

Lack of rapid progress in 6 cellblock and in the honor dormitory should not be equated with resistance on the part of the institution. Assignment to 6 cellblock is dependent upon specific job assignments, and many of the inmates currently assigned to that unit have relatively long terms of imprisonment ahead of them. If this cellblock is to continue to be allotted, racial balance in housing assignments will require racial balance in the job assignments represented in 6 cellblock. The alternative is to discontinue the practice of permitting staff assignments to the cellblock. In either case, unless the settled interests of large numbers of white inmates are to be disturbed, progress will be slow. In view of the findings contained in his first report, the Special Master admits to some surprise that the institution has permitted the racial imbalance in 6 cellblock to increase.

Alteration of the racial pattern in the two living units in the honor dormitory presents equally difficult problems. The privilege to choose one's own bed after an initial period of 90 days is one of great importance to the inmates in the honor dormitory. In the opinion of the Special Master, assignment to the honor dormitory, like most things in life, is something of a mixed blessing. The inmate gains certain privileges, including his right to choose his bed, carry up to five dollars, use a pay telephone, have access to extra food and snacks, and enjoy unlimited weekend visiting privileges. On the other hand, he loses all weekday visits, as well as access to vocational and academic educational programs, use of the institution library, and enjoyment of the gymnasium. The point is that such privileges as are associated with honor status are guarded jealously by those who have obtained them. Yet it is the exercise of this privilege by inmates which has resulted in segregated housing units in the honor dormitory.

Procedures controlling assignment of beds in dormitories within the stockade continue to comply with the requirements of Paragraph 11 of the Court's order. While problem areas continue to crop up from time to time, it is clear that the staff member charged with the responsibility for making bed assignments and approving requests for bed transfer makes every effort to maintain integrated bed rows. As of August 5, 1976, there were no fully segregated bed rows in any stockade dormitory; however, five dormitories (2, 3, 3–C, 4, and 6) have one or two bed rows with four or fewer whites per 17 man row. These isolated instances of imbalance require the continued careful attention of the assigning staff member.

Finally, one matter not referred to in the Special Master's first report should be noted. Bed assignments in several cellblocks have produced patterns in which some rows are heavily dominated by a particular race. For example, in 1 cellblock one upper tier row contains five blacks and 12 whites; the opposite breakdown occurs on a lower tier row. In 2 cellblock the upper tier is predominately black and the lower tier is predominately white. In 6 cellblock there is one completely white row and another with 15 of 17 cells occupied by whites. Care must be taken in the making of future assignments to cellblocks to avoid the development of the problem which led to the Court's order with respect to dormitory bed assignments.

## CONCLUSIONS AND RECOMMENDATIONS

Apart from the unfortunate decrease in the number of white inmates in 2 dormitory and 3–C dormitory, the gradual process of increased assignment of whites to dormitories appears to be having a desirable effect upon the racial balance in those living units. The same is true with respect to the assignment of black inmates as gradual vacancies occur in cellblocks. It is the recommendation of the Special Master that

the Court find the institution to be in compliance with Paragraph 11 insofar as it relates to assignment of inmates to various housing units within the stockade when the racial balance in each dormitory and cellblock reflects the racial balance of the overall stockade population allowing for a deviation factor of ±5%. Since assignment to 5 dormitory, 5-E, dormitory and 2-B dormitory is based upon enrollment in a special rehabilitation or educational program, these units should be excepted from this standard so long as assignment to these programs is made on a nondiscriminatory basis.

With respect to the problem presented by 6 cellblock, it is the recommendation of the Special Master that no further white inmates be assigned to that unit until the population ratio has met the requirement stated above. The institution may accomplish this in one of several ways. It may cease to maintain an allotted cellblock. If, on the other hand, the maintenance of such a unit is desirable, it may make future relevant job assignments to blacks. Finally, it may choose to maintain a partially allotted cellblock and to make non-allotted assignments in such a way as to produce the necessary racial balance.

The Special Master recommends strongly that no inmate be transferred from his current housing assignment (or, in the case of a resident of 6 cellblock, his job) purely on the basis of his race. In spite of the delay which reliance upon natural attrition will necessitate, any other course of action would be unfair to affected inmates and, in the opinion of the Special Master, highly dangerous to the safety and security of the institution.

Finally, with respect to the bed pattern which exists in the honor dormitory, the Special Master believes that the best vehicle for attempting to resolve this issue lies with the new 6 man inmate council in the honor dormitory. The Special Master therefore proposes to enter into discussions with this group with a view toward obtaining the inmates' recommendations for a solution to this problem which will at the same time preserve, to the greatest extent possible, the freedom of choice now enjoyed by residents of the honor dormitory.

## PARAGRAPH 12

The first report of the Special Master disclosed a copy of a Writ of Habeas Corpus Ad Testificandum bearing the caption, *Taylor v. Perini,* in the file of George Bennett, 128-317. *Taylor v. Perini,* 413 F.Supp. 189, 261 (N.D.Ohio 1976). No other direct references to participation in this litigation were discovered in the earlier examination of the 55 files still maintained at M.C.I., although a number of memoranda were discovered which in fact related to *Taylor v. Perini.*

Superintendent Perini has caused the caption in the document in George Bennett's file to be completely obliterated. Mr. Perini has asked that the document itself be retained in the file, as he must maintain complete records to justify an inmate's absence from the institution at any time. No other documents referred to in the Special Master's first report have been removed.

The 11 files not examined at the time of the first report of the Special Master were obtained from the Department of Rehabilitation and Correction and were examined by the Special Master's Assistant. The only relevant document discovered was a disciplinary report in the file of Michael McClintock, 129-575, dated May 11, 1972, indicating that the inmate could not be transferred to the Ohio Penitentiary as had been recommended until approval was obtained "from Judge Young." There is no specific reference to *Taylor v. Perini.*

## CONCLUSIONS AND RECOMMENDATIONS

■ It is the conclusion of the Special Master that the institution is in full compliance with Paragraph 12 of the Court's order. Only one with detailed knowledge of this litigation would relate the memoranda remaining in inmates' files to *Taylor v. Perini.* The obliteration of the caption in the document contained in George Bennett's file is sufficient to prevent identification of that inmate with this lawsuit.

## PARAGRAPH 13

Weekly reports submitted by the institution to the Special Master disclose that copies of the Court's order of September 12, 1972, continue to be posted on bulletin boards in all housing areas in the institution. This has been confirmed by irregular on-site inspections by the Special Master and his Assistant. Copies of the order are posted in other areas throughout the institution and are available to staff members.

## CONCLUSIONS AND RECOMMENDATIONS

The institution remains in full compliance with this paragraph of the Court's order.

Respectfully submitted,

(S) Vincent M. Nathan

Vincent M. Nathan

Special Master

### APPENDIX A

## STANDARDS FOR EXCLUSION OF PRINTED MATERIALS

*General Criteria:*

1. "Printed materials" falling within the scope of this provision include the following: (a) newspapers, (b) magazines, (c) pamphlets, (d) books, (e) photographs, whether or not of persons known or related to the inmate, drawings, and pre-recorded commercial tape recordings. "Printed materials" do *not* include personal letters, official mail, or pre-recorded personal, as opposed to commercial, tape recordings.

2. Printed material, in order to be excludable, must be obscene or must constitute a clear and present danger to the security or safety of Marion Correctional Institution.

*Criteria for Obscenity:*

In order to be "obscene" and thus subject to exclusion, printed material must meet *all* of the following standards, which should be considered in the order in which they are stated. Material failing to meet any one or more of these standards must be admitted to the institution.

1. The printed material depicts or describes, in a patently offensive way, sexual conduct falling within one or more of the following categories:

 (a) Nudity emphasizing a state of sexual arousal or stimulation. eg. a male erection or a graphic exposure of the clitoris.

 (b) Nudity emphasizing masturbatory activity.

 (c) Portrayal of explicit sexual acts, heterosexual or homosexual, including vaginal, anal, oral, and manual acts.

 (d) Portrayal of acts of bestiality (sexual relations between a human being and an animal.)

 (e) Portrayal of acts of sado-masochism in the form of sexually oriented materials depicting or describing the infliction of pain.

 (f) Explicit portrayal of human excretory function.

2. The average person, applying contemporary community standards, would find that the printed material, taken as a whole, appeals to the prurient interest.

3. The printed material, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Definitions:*

1. "Contemporary community standards" —The standards prevalent in the relatively tolerant social environment of an urban center, such as Columbus or Cleveland, characterized by the wide range of sexually oriented movies, television programs, literature, and magazines which are available to the general public in such an urban center.

2. "Taken as a whole"—As applied to criterion (2) above, this phrase means that the obscenity is pervasive and affects a substantial portion of the printed material. An isolated depiction or description is not sufficient to warrant exclusion. As applied to criterion (3) above, the term means a substantial and serious value. A

mere pass at some contrived literary, artistic, political, or scientific reference is not sufficient to save otherwise excludable material.

3. "Prurient interest"—An interest in that which is lewd or lustful.

4. "Patently offensive"—An offensive depiction or description which is graphic or explicit rather than merely suggestive.

5. "Nudity"—The graphic or explicit portrayal of the naked penis or vagina.

*Criteria for Clear and Present Danger:*

In order to constitute a clear and present danger to the security or safety of Marion Correctional Institution, the printed material must meet one or more of the following criteria:

1. Printed material which incites, aids, or abets criminal activity such as rioting or illegal drug use.

2. Printed material which incites, aides, or abets physical violence against inmates or staff, including instruction in making, using, or converting weapons.

3. Printed material which incites, aids, or abets escape such as instruction in picking locks or digging tunnels.

The following are *examples* of printed materials which do *not* constitute a clear and present danger to Marion Correctional Institution:

1. Printed materials which appeal to a particular ethnic, racial, or religious audience.

2. Printed materials which advocate laws, policies and positions not shared by the Department of Rehabilitation and Correction, the Administration of Marion Correctional Institution, the State of Ohio, or the government of the United States of America.

3. Printed materials advocating law reform or change such as the abolition of prisons, payment of minimum wages to inmates, or the decriminalization of certain conduct.

4. Criticisms, whether or not accurate or fair, of Marion Correctional Institution in particular or correctional institutions in general.

## APPENDIX B

TO: _____ LOCK: _____

FROM: THE PUBLICATION SCREENING COMMITTEE

RE: PUBLICATION REVIEW HEARING Case # _____

The following printed material, addressed to you, has been referred to the institution Publication Review Committee for review on the grounds that it is:

( ) Obscene ( ) Constitutes a clear and
 present danger to the security
 or safety of the institution.

_____

_____

This material will be reviewed by the Institution Publication Review Committee on the date noted. You may attend this meeting if you wish.

You will be informed of the Committee's decision shortly after the meeting.

MEETING:_____

Publication Review Committee Date:_____

---

INMATE IS TO COMPLETE THE FOLLOWING AND RETURN TO THE ABOVE

( ) I have received the notice concerning the above hearing.

( ) 'I wish to appear before the committee.

( ) I do not wish to appear before the committee. I understand that
 the committee will notify me of the decision.

_____ _____
Inmate's signature number Date

PLEASE RETURN THE COPY TO ME AS SOON AS POSSIBLE. YOU MAY KEEP THE
ORIGINAL COPY FOR YOUR INFORMATION.

DISTRIBUTION

Original-inmate
copy 1 - inmate return to commitee
copy 2 - retain for file

JM:cb

FORM PR1

## APPENDIX C

### NOTICE OF DECISION
### PUBLICATION REVIEW COMMITTEE

TO: _____ NUMBER: _____ CASE # PR _____

---

DESCRIPTION OF MATERIAL

---

DECISION OF THE PUBLICATION REVIEW COMMITTEE

( ) This material is acceptable and will be returned to the inmate.

( )) This material is unacceptable as follows:

 ( ) It is obscene.
 ( ) It constitutes a clear and present danger to
 the security or safety of the institution.

778 

A DECISION REGARDING UNACCEPTABLE MATERIAL REQUIRES JUSTIFICATION BELOW

_____

| | Acceptable: ____ | |
|--------------------------------------|-------------------|----------|
| Publication Review Committee | Unacceptable: ____ | _____ |
| | Vote | Date |

You have the right to appeal the above decision to the PUBLICATION REVIEW COMMITTEE, DEPARTMENT OF REHABILITATION AND CORRECTION, 1050 FREEWAY DRIVE, NORTH, COLUMBUS, OHIO 43229.

Inmate is to complete the following:

( ) I wish to appeal the decision to the publication screening committee of the Department of Rehabilitation and Correction. I request that the material be forwarded with a copy of the committee's decision. I will assume responsibility for completing the appeal form and mailing it to that committee.

( ) I do not wish to appeal the decision of the Institution Publication Review Committee and:

 ( ) I authorize the Chairman of the committee to destroy the material, or

 ( · ) I request that this material be mailed out of the institution at my own expense to the following person:

_____

INMATE'S SIGNATURE: _____ DATE: _____

cc: Inmate FORM PR2

## APPENDIX D

TO: Publication Review Committee
 Department of Rehabilitation and Correction
 1050 Freeway Drive North
 Columbus, Ohio 43229

RE: APPEAL OF INSTITUTION PUBLICATION REVIEW DECISION

CASE NUMBER: _____

On _____, 19_____, I was informed that the publication review committee of the Marion Correctional Institution found the following material unacceptable for release to me:

_____

_____

APPENDIX D.—Continued

I appeal this decision for the following reasons: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

PLEASE USE THE BACK OF THIS FORM IF ADDITIONAL SPACE IS NEEDED

_____ MCI# _____ DATE _____
Inmate's signature

FORM PR 3-1976

## APPENDIX E

TO: _____ MCI# _____ LOCK _____

RE: <u>PUBLICATION REVIEW COMMITTEE DECISION</u> CASE NUMBER: _____

The attached material was considered by the institution Publication Review Committee and found to be acceptable for receipt by an inmate at the Marion Correctional Institution. The committee regrets the delay which resulted from the screening of this material.

_____ _____
 Publication Review Committee Date

CC: Publication Review File

FORM PR 4-1976

APPENDIX F to follow

## APPENDIX F

**MINUTES OF THE PUBLICATION REVIEW COMMITTEE**
**MARION CORRECTIONAL INSTITUTION**

| DATE | NUMBER | NAME | CASE # | MATERIAL | DISPOSITION | VOTE | |
|------|--------|------|--------|----------|-------------|--------|--------|
| | | | | | | ACCEPT | REJECT |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |